

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Danosa Caribbean, Inc.<br><br>Recurridos<br><br>v.<br><br>Santiago Metal Manufacturing Corp., Juan del Pueblo XYZ, Inc.<br><br>Peticionarios | Certiorari<br><br>2010 TSPR 77<br><br>179 DPR ____ |

Número del Caso: CC-2008-882

Fecha: 19 de mayo de 2010

Tribunal de Apelaciones:

   Región Judicial de Carolina Guayama Panel XIII

Juez Ponente:

   Hon. Rafael Ortiz Carrión

Abogada de la parte peticionaria:

   Lcda. Livia M. Rosado Bermúdez

Abogado de la parte Recurrida:

   Lcdo. Luis E. Palacios

Materia: Cobro de Dinero

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Danosa Caribbean, Inc.

      Recurridos

           v.

Santiago Metal Manufacturing
Corp., Juan del Pueblo XYZ, Inc.

      Peticionarios

CC-2008-882

SENTENCIA

San Juan, Puerto Rico, a 19 de mayo de 2010.

Por medio del presente recurso de *certiorari* se nos solicita que revisemos la Sentencia emitida por el Tribunal de Apelaciones en el caso de autos. En ella, el foro apelativo intermedio revocó el dictamen del Tribunal de Primera Instancia.

Debemos resolver si de los hechos surge que se perfeccionó un contrato entre las partes. De entender que no se perfeccionó un contrato, debemos resolver cuál es el criterio para determinar el importe a que tiene derecho un contratista cuando se pacta un cambio en la obra sin acuerdo sobre el precio.

Examinemos los hechos que originaron la presente controversia.

I

El Municipio de San Sebastián, dueño de la obra, contrató a Vissepó & Diez Construction Corp., en adelante Vissepó, como contratista general para el techado del Coliseo del Municipio de San Sebastián, en adelante el Coliseo. Para realizar el aludido trabajo, Vissepó subcontrató a Santiago Metal Manufacturing Corp., en adelante Santiago. A su vez, el 12 de octubre de 2001, Santiago subcontrató a Danosa Caribbean, Inc., en adelante Danosa, para que realizara el techado del Coliseo.[1] Danosa cotizó por la obra la cantidad de $145,774.00, la cual fue aceptada por Santiago.

Durante la ejecución de la obra se realizaron dos (2) cambios al proyecto para realizar trabajos no convenidos en el contrato original.[2] **El segundo de los cambios es el que suscita la presente controversia.**[3] Éste tenía como propósito cubrir la parte inferior del alero del Coliseo con unas planchas de metal.

---

[1] Ambas partes acordaron un contrato de ejecución de obras.

[2] Los cambios realizados a un proyecto de construcción son conocidos en la industria de la construcción como "change orders". También suelen utilizarse los términos de "orden de cambio" o "cambio de orden". En lo sucesivo nos referiremos a los aludidos cambios como "ordenes de cambio" u "orden de cambio", según aplique. En el presente caso, los cambios al proyecto de construcción son producto de la Orden de Cambio Número Uno (1) de 14 de noviembre de 2002 y de la Orden de Cambio Número Dos (2), para la cual se confeccionaron dos (2) documentos: uno con fecha de 3 de abril de 2003 y otro con fecha de 23 de abril de 2003.

[3] Orden de Cambio Número Dos (2).

El 9 de agosto de 2002, Santiago le cotizó a Vissepó la obra, objeto de la segunda orden de cambio, con miras a subcontratar a Danosa. En dicha cotización Santiago estimó el costo de la obra por la cantidad de **$29,498.60.**[4] Esta cotización fue realizada por Santiago antes de conocer la cotización de Danosa, puesto que Vissepó le presionaba para evitar retrasos en la obra.

El 25 de octubre de 2002, Danosa le envió una carta a Santiago en la que cotizó el proyecto objeto de la segunda orden de cambio por la cantidad de **$63,680.00.** Además, Danosa le indicó a Santiago que esperaba por su aprobación para proceder a efectuar el trabajo. Sin embargo, para esa fecha Danosa ya había comenzado los trabajos para instalar las planchas de metal en el alero del Coliseo. Para ello, Danosa subcontrató a Cibel Metal Products, en adelante Cibel.

El 1 de noviembre de 2002, Santiago le envío una carta a Danosa en la que aludió a una conversación telefónica entre ambos. En la referida carta, Santiago confirmó el contenido de la comunicación telefónica "en relación a los trabajos adicionales de cubrir la parte inferior del alero con el mismo material del techo".[5]

---

[4] Santiago tomó como base para su cotización el hecho de que el área del techo medía 15,191 pies cuadrados y costaría $145,774.00, según la cotización de Danosa, mientras que el alero tenía un área menor a 2,000 pies cuadrados.

[5] Carta de Santiago dirigida a Danosa, con fecha de 1 de noviembre de 2002. *Véase*, Apéndice, a la pág. 68.

Además, Santiago se responsabilizó por los costos adicionales de surgir problemas con el diseñador. **Sin embargo, en la referida carta no se estableció el precio pactado.**

El 22 de noviembre de 2002, Cibel, subcontratista de Danosa, concluyó la instalación de las planchas de metal en el alero del Coliseo. Por ello, Danosa le pagó la totalidad del trabajo realizado, antes de que la segunda orden de cambio fuera tramitada.[6]

En relación a la segunda orden de cambio, Santiago confeccionó dos (2) documentos. El primer documento estableció la cantidad de $63,680.00, mientras que el segundo documento fijó la suma de $29,047.10 para la obra objeto de la segunda orden de cambio.[7] **Ambos documentos establecen que no serán válidos hasta que sean firmados por el dueño de la obra y el contratista.**[8] Sin embargo, ninguno de los documentos fue firmado por ambas partes. El primer documento fue firmado sólo por Danosa el 3 de abril de 2003, mientras que el segundo fue firmado exclusivamente por Santiago el 23 de abril de 2003. Nótese, que para ambas fechas la obra en controversia

---

[6] El primer documento de la Orden de Cambio Número Dos (2) fue tramitado el 3 de abril de 2003.

[7] El cambio de precio se realizó para corregir una equivocación en la cuantía producto de un error de la persona que tomó la información por parte de Santiago. Una vez Santiago se percató del error, sustituyó la primera cifra por la cantidad aprobada por Vissepó.

[8] "Not valid until signed by the Owner and Contractor". *Véase*, Apéndice, a las págs. 80 y 81.

había concluido. Posteriormente, mediante comunicación escrita, Danosa y Santiago intentaron negociar la cantidad adeudada sin poder llegar a un acuerdo.

Así las cosas, el 13 de abril de 2007, Danosa presentó en el Tribunal de Primera Instancia una demanda de cobro de dinero en contra de Santiago. En la demanda, Danosa reclamó la cantidad de $63,680.00 por la obra realizada en el alero del Coliseo.[9] Santiago contestó la demanda y aceptó que había una deuda, pero negó que ésta fuese por la cantidad reclamada.

Luego de celebrado el juicio en su fondo, el 17 de marzo de 2008, el Tribunal de Primera Instancia declaró con lugar la demanda de cobro de dinero presentada por Danosa. Su decisión se amparó en la doctrina de enriquecimiento injusto. Ello, por entender que entre las partes no existía un contrato válido sobre la segunda orden de cambio. A esos efectos, el foro primario concluyó que ninguno de los dos (2) documentos de la orden de cambio en controversia contó con la firma de ambas partes.

El Tribunal de Primera Instancia entendió que Danosa inició los trabajos sin consentimiento de Santiago, por lo que asumió el riesgo de que su cotización fuera rechazada, como en efecto sucedió. El foro primario entendió que

---

[9] Danosa también reclamó otras cantidades de dinero alegadamente adeudadas por Santiago. Luego de varios trámites procesales, Santiago pagó las sumas que no estaban en disputa. De esa forma, la controversia quedó reducida a la cantidad de $63,680.00 que Danosa alega Santiago le debe por el trabajo objeto de la segunda orden de cambio.

Santiago cometió un error el cual intentó subsanar mediante un ajuste en el precio de la segunda orden de cambio. Sin embargo, Santiago no obtuvo confirmación de Danosa para tal reducción en el precio. Por tanto, el Tribunal de Primera Instancia dictaminó que Santiago asumió también el riesgo y Danosa no aceptó.

Al declarar con lugar la demanda, el foro primario le ordenó a Santiago pagarle a Danosa la cantidad de $29,498.60 en vez de la cantidad $63,680.00 reclamada por Danosa.[10] Además, el Tribunal de Primera Instancia le ordenó a Danosa el pago de $2,000.00 en concepto de honorarios de abogado por temeridad. Ello, por entender que Danosa insistió en su reclamo hasta las últimas consecuencias "a pesar de reconocer la falta de las dos firmas para validar la orden de cambio".[11]

Inconforme con el dictamen del Tribunal de Primera Instancia, Danosa presentó un recurso de apelación ante el Tribunal de Apelaciones. El 20 de junio de 2008, el foro apelativo intermedio emitió una Sentencia en la que revocó al foro primario y resolvió lo siguiente: (1) que existía un contrato entre las partes; (2) que el precio convenido en el contrato era el reclamado por Danosa, a saber: $63,680.00; y (3) eliminó la partida concedida a favor de

---

[10] La suma establecida por el Tribunal de Primera Instancia es igual a la recibida por Santiago de parte de Vissepó por concepto del trabajo aludido en la segunda orden de cambio.

[11] *Véase*, Apéndice, a la pág. 108.

Santiago en concepto de honorarios de abogado por temeridad.

Insatisfecho con el dictamen emitido por el Tribunal de Apelaciones, Santiago acudió ante nos mediante recurso de *certiorari* señalando la comisión del error siguiente:

> **Erró el Tribunal de Apelaciones al determinar que no había controversia en cuanto a las determinaciones de hechos que hizo el Tribunal de Primera Instancia y luego intervenir con la apreciación de la prueba del Tribunal de Primera Instancia para finalmente determinar que hubo un contrato válido entre las partes y concluir que no era de aplicación la doctrina de enriquecimiento injusto.**

El 20 de marzo de 2009, expedimos el auto de *certiorari* solicitado en el caso de autos. Con el beneficio de la comparecencia de ambas partes, revocamos en parte la Sentencia emitida por el Tribunal de Apelaciones y devolvemos el caso al Tribunal de Primera Instancia para que a tenor con la prueba presentada y admitida se adjudique si se pactó el precio de la obra producto de la segunda orden de cambio. Confirmamos la determinación del foro apelativo intermedio de eliminar la partida de honorarios de abogado por temeridad.

Lo acordó el Tribunal y lo certifica la Secretaria del Tribunal Supremo. El Juez Presidente señor Hernández Denton emitió opinión concurrente y disidente. El Juez Asociado señor Rivera Pérez concurre con opinión escrita a la cual se unen la Jueza Asociada señora Pabón Charneco y el Juez Asociado señor Kolthoff Caraballo. El Juez Asociado señor Martínez Torres concurre con opinión

escrita. La Jueza Asociada señora Rodríguez Rodríguez disiente con opinión escrita a la cual se une la Jueza Asociada señora Fiol Matta.


                              Aida Ileana Oquendo Graulau
                              Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Danosa Caribbean, Inc.

 Demandante-Recurrido

       v.                                CC-2008-882

*Certiorari*

Santiago Metal Manufacturing
Corp., Juan del Pueblo XYZ, Inc.

 Demandada-Peticionaria

Opinión Concurrente y Disidente emitida por el Juez Presidente SEÑOR HERNÁNDEZ DENTON

San Juan, Puerto Rico, a 19 de mayo de 2010.

Concurrimos con el resultado de la Sentencia emitida en el día de hoy al revocar en parte el dictamen del Tribunal de Apelaciones. No obstante, disentimos del proceder del Tribunal de devolver el caso al foro de instancia para que determine si se pactó o no el precio de la obra requerida por la orden de cambio en controversia. Somos del criterio que el precio no se pactó, por lo que devolveríamos el asunto al foro primario para que determine únicamente el importe al que tiene derecho el contratista a la luz de la jurisprudencia de este Tribunal.

I.

De la prueba presentada y admitida ante el foro de instancia surge que Santiago Metal Manufacturing Corp. (Santiago Metal) estimó lo que costaría el cambio en la obra y así le cotizó al contratista general, quien le pagó la cantidad solicitada. Dicha gestión se hizo antes de recibir la cotización de Danosa Caribbean, Inc., a quien Santiago Metal había subcontratado para realizar el trabajo.

Varios meses más tarde, Danosa remitió su cotización a Santiago Metal e inició el trabajo, mas lo hizo sin recibir la aprobación de Santiago Metal de dicha cotización. A pesar de que Santiago Metal preparó los documentos de orden de cambio, los cuales requerían la firma tanto de Santiago Metal como de Danosa para ser válidos, éstos no se llegaron a firmar por ambas partes, por lo que surgió la controversia que nos ocupa sobre el precio de la orden de cambio. Danosa alega que tiene derecho a que se le pague la totalidad de lo que cotizó por la obra realizada a raíz del cambio que solicitó Santiago Metal, lo cual ésta última niega por entender que nunca aceptó dicha cotización.

Como es sabido, según el Art. 1485 del Código Civil, 31 L.P.R.A. sec. 4126, el contratista sólo tendrá derecho a exigir un aumento en el precio de la obra cuando se haya realizado algún cambio en ésta, siempre que haya mediado la autorización del dueño. En ausencia de precio pactado para dicha modificación, nuestra jurisprudencia ha reconocido el criterio del aumento en valor de la obra efectuada como mecanismo para determinar el importe a pagarse. Dicho importe

equivale a la diferencia entre el costo de la obra según el contrato original y el costo de la obra realizada según la modificación. Zequeira v. C.R.U.V., 83 D.P.R. 878 (1961).

En el caso de autos, el Tribunal de Primera Instancia, luego de recibir y aquilatar prueba al respecto, determinó que ésta había sido confusa en cuanto a si se pactó el precio, por lo que aplicó la doctrina de enriquecimiento injusto y ordenó a Santiago Metal a pagar a Danosa sólo lo que había recibido del contratista general a base de su cotización inicial. Es decir, ya el foro de instancia determinó que no se había pactado el precio.

Por su parte, el Tribunal de Apelaciones concluyó que Santiago Metal había aceptado tácitamente la cotización de Danosa al no oponerse a ésta y permitir que la obra se realizara. Discrepamos de este criterio, pues la prueba presentada ante el Tribunal de Primera Instancia fue conflictiva al respecto.

Del expediente ante nuestra consideración surge que las partes convinieron en realizar una modificación a la obra, mas no pactaron el precio que ésta conllevaría. Por lo tanto, entendemos que es de aplicación la doctrina pautada en Zequeira v. C.R.U.V., supra, en cuanto a que el contratista sólo tiene derecho al aumento en valor de la obra en aquellos casos en que se ordena un cambio sin que se pacte precio alguno.

No obstante, la Sentencia que emite hoy el Tribunal devuelve el caso al foro de instancia para que, una vez más, determine si el precio se pactó o no. Entendemos que este

proceder es errado y redunda en una duplicidad procesal que evita que el caso se resuelva con la prontitud que las partes merecen.

II.

En vista de lo anterior, concurrimos con el proceder del Tribunal de revocar la sentencia recurrida, pero disentimos en cuanto a la devolución del caso al Tribunal de Primera Instancia para que dicho foro determine si se pactó el precio. Contrario al dictamen que hoy emite el Tribunal, y según surge del expediente, entendemos que el precio no se pactó. Por consiguiente, devolveríamos el caso al Tribunal de Primera Instancia únicamente a los efectos de calcular el aumento en valor de la obra y así determinar el importe al que tiene derecho Danosa conforme a la norma establecida por este Tribunal en Zequeira v. C.R.U.V., *supra.*

Federico Hernández Denton
Juez Presidente

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Danosa Caribbean, Inc.

     Recurridos

         v.

Santiago Metal Manufacturing
Corp., Juan del Pueblo XYZ,
Inc.

     Peticionarios

CC-2008-882

Opinión Concurrente emitida por el Juez Asociado señor Rivera Pérez a la cual se unen la Jueza Asociada señora Pabón Charneco y el Juez Asociado señor Kolthoff Caraballo.

San Juan, Puerto Rico, a 19 de mayo de 2010.

I

En nuestro ordenamiento jurídico las partes pueden establecer los pactos que entiendan convenientes en un contrato, siempre que no sean contrarios a la ley, a la moral, ni al orden público.[12] Para que un contrato nazca válidamente es necesario que concurran los requisitos de objeto, consentimiento y causa.[13] Las partes pueden contratar en la forma que entiendan más conveniente. Ello se debe a que, como regla general, los contratos no tienen requisitos de forma, "siempre

---

[12] 31 L.P.R.A. § 3372.

[13] 31 L.P.R.A. § 3391.

que en ellos concurran las condiciones esenciales para su validez".[14]

Nuestro Código Civil dispone que "[e]l consentimiento se manifiesta por el concurso de la oferta y de la aceptación sobre la cosa y la causa que han de constituir el contrato".[15] La voluntad contractual ha de manifestarse para que exista consentimiento, de manera que el acuerdo de voluntades se formará mediante lo declarado por una y otra parte. La intención de los contratantes se verifica en atención a los actos coetáneos y posteriores de las partes.[16]

En un contrato de ejecución de obras se puede pactar la realización de una obra en la que una parte ponga su trabajo y/o los materiales.[17] El contrato de ejecución de obras es consensual, bilateral y oneroso.[18] En este tipo de contrato una parte se obliga a hacer una cosa y la otra se compele a dar por ella el precio pactado. En específico, el dueño de la obra tiene la obligación de pagar el precio de ésta en la forma, cuantía y tiempo convenido. El contratista, por su parte, tiene la obligación de realizar y entregar la obra conforme a lo convenido en el contrato, a las reglas del

---

[14] 31 L.P.R.A. § 3451.

[15] 31 L.P.R.A. § 3401.

[16] 31 L.P.R.A. § 3472.

[17] 31 L.P.R.A. § 4121.

[18] *Master Concrete v. Fraya*, 152 D.P.R. 616, 624 (2000).

arte de la construcción y a los usos o reglas profesionales.[19]

El precio acordado en un contrato de ejecución de obras determina a qué tiene derecho el contratista, salvo que haya un cambio en la obra con aprobación del dueño de la obra.[20] Cuando ello ocurre, el contratista puede pedir un aumento de precio.[21] **De acuerdo a Manresa, "[e]ste aumento de precio no procede de la naturaleza del contrato, sino de la verdadera novación que las partes han introducido en él".[22]**

Una orden de cambio es una novación al contrato original.[23] El precio pactado en una orden de cambio determina el importe a que tiene derecho el contratista. En *Salgado v. Figueroa*,[24] expresamos que cuando se acuerda un cambio de obra sin pactar el precio, el criterio para fijar el importe es el **valor razonable** de los servicios prestados. En esa ocasión, luego de perfeccionado un contrato de construcción, el dueño de la obra le requirió al contratista que realizara ampliaciones y modificaciones en la obra. Sin embargo, el precio por el referido aumento de trabajo no se

---

[19] *Íd.*

[20] 31 L.P.R.A. § 4126.

[21] *Íd.*

[22] Manresa y Navarro, *Comentarios al Código Civil Español*, 6ta ed., Madrid, Ed. Reus, 1969, Tomo X, Vol. II, pág. 721. (Énfasis nuestro).

[23] *Íd.*

[24] 33 D.P.R. 931 (1925).

pactó.[25] Resolvimos en aquella ocasión que el contratista puede reclamar y obtener el **valor razonable** de sus servicios. Además, expresamos que el valor razonable por el aumento de trabajo era el que justificara la prueba y no la estimación y apreciación personal que de sus servicios hacía el contratista.[26]

Cabe mencionar, que en *Salgado*, *supra*, atendimos la aludida controversia bajo el Artículo 1473 del Código Civil,[27] el cual dispone lo siguiente:

> Pueden arrendarse los servicios de criados y trabajadores sin tiempo fijo o por cierto tiempo. El arrendamiento hecho por toda la vida es nulo. En cuanto a los servicios profesionales, se estará, para la remuneración de los mismos, a lo convenido entre las partes; cuando no hubiere convenio y surgieren diferencias, la parte con derecho a la remuneración podrá reclamar y obtener en juicio de la otra parte, ante cualquier corte de jurisdicción competente, el importe razonable de dichos servicios.[28]

No obstante lo anterior, en *Zequeira v. Municipal Housing Authority*,[29] atendimos la misma controversia que en *Salgado*, *supra*, pero bajo el Artículo 1485 del Código Civil,[30] el cual establece lo siguiente:

> El arquitecto o contratista que se encarga por un ajuste alzado de la construcción de un edificio u otra obra en vista de un plano convenido con el propietario del suelo no puede pedir aumento de

---

[25] El contratista también suplió los materiales para el trabajo requerido.

[26] *Salgado v. Figueroa*, *supra*, a la pág. 934.

[27] 31 L.P.R.A. § 4111.

[28] *Íd.*

[29] 83 D.P.R. 878 (1961).

[30] 31 L.P.R.A. § 4126.

precio aunque se haya aumentado el de los jornales o materiales, pero podrá hacerlo cuando se haya hecho algún cambio en el plano que produzca aumento de obra, siempre que hubiese dado su autorización el propietario.[31]

En *Zequeira*, *supra*, resolvimos que cuando se realiza una orden de cambio sin pactar su costo, para determinar el aumento de precio reconocido en el Artículo 1485 del Código Civil, *supra*, hay que determinar el costo de la mano de obra y de los materiales acordados en el pacto original, advirtiendo la diferencia de ese costo con el nuevo acuerdo.[32] En Zequeira, *supra*, expresamos además que "la única base para añadir a dicho costo de mano de obra y materiales, las pólizas del seguro social y de la indemnización a obreros sería el aumento en el personal obrero y la extensión en el tiempo adicional que requirió la terminación del contrato".[33] Asimismo, entendimos que el criterio de valor razonable o *quantum meruit* no es de aplicación cuando se hace una orden de cambio sin pactar su precio.[34]

El valor razonable o *quantum meruit*[35] está basado en la doctrina de enriquecimiento injusto.[36] En otras

---

[31] *Íd.*

[32] *Zequeira v. Municipal Housing Authority*, *supra*, a las págs. 884-886.

[33] *Íd.*, a las págs. 885-886.

[34] *Íd.*, a la pág. 884.

[35] *Quantum meruit* significa "tanto como se merece". I. Rivera García, *Diccionario de Términos Jurídicos*, 3ra ed. Revisada, San Juan, LEXIS PUBLISHING, 2000, pág. 345.

[36] *Pérez Marrero v. Colegio de Cirujanos Dentistas de P.R.*, 131 D.P.R. 545, a la pág. 558, nota al calce 9.

jurisdicciones estatales de Estados Unidos, al igual que lo resuelto en *Salgado*, *supra*, el valor razonable es el criterio para fijar la cuantía debida cuando una persona ha realizado algún servicio para otra sin acuerdo sobre el precio o bajo un contrato invalidado por alguna irregularidad en la forma de ejecutarlo.[37] Cuando hay un contrato en el que se estipula el precio de la obra no cabe hablar del valor razonable, teniendo las partes que sujetarse al importe pactado en el contrato. **Pero cuando no se pacta el precio, se entiende que las partes han consentido a que el importe sea el valor razonable en el mercado por la obra realizada.[38] En otras palabras, el criterio para medir el valor razonable de la obra es la cantidad que costaría obtener dicha obra de otro contratista en la posición del demandante, al momento en que la obra fue entregada.[39]**

La doctrina de enriquecimiento injusto es un principio general del derecho fundado en la equidad, que está presente en todo el ordenamiento jurídico.[40] Al igual que otras acciones basadas en la equidad, la reclamación por enriquecimiento injusto aplica cuando no existe ley que provea para otra causa de acción.[41] Es decir, se habla de

---

[37] *Véase*, 66 Am. Jur. 2d Restitution and Implied Contracts § 37 y § 85.

[38] *Véase*, Pauline Ruyle Moore, *A Proposal to Simplify Quantum Meruit Litigation*, 35 Am. U.L. Rev. 547, 556 (1986).

[39] *Véase*, 26 A.L.R. Fed. 746 (2008).

[40] *Ortiz Andújar v. E.L.A.*, 122 D.P.R. 817, 822 (1988).

[41] *Íd.*

enriquecimiento injusto "cuando la ley no ha previsto una situación en la que se produce un desplazamiento patrimonial que no encuentra una explicación razonable en el ordenamiento vigente".[42]

Para que la doctrina de enriquecimiento injusto pueda ser invocada exitosamente, es necesario que concurran los requisitos siguientes: (1) existencia de un enriquecimiento; (2) un correlativo empobrecimiento; (3) una conexión entre el empobrecimiento y el enriquecimiento; (4) falta de causa que justifique el enriquecimiento; y (5) inexistencia de un precepto legal que excluya la aplicación del enriquecimiento sin causa.[43]

La doctrina de enriquecimiento injusto se encuentra subsumida en la figura de los cuasicontratos.[44] La aplicación de la doctrina de enriquecimiento injusto depende de las circunstancias específicas de cada caso.[45] Ello se debe a que el Código Civil no agota las situaciones a las que la referida doctrina se extiende.[46]

El Tribunal de Primera Instancia es acreedor de gran deferencia en cuanto a sus determinaciones de hechos. Las

_____

[42] *Íd., citando a* Puig Brutau, *Fundamentos del Derecho Civil*, Barcelona, Ed. Bosch, 1983, T. II, Vol. 3, pág. 44.

[43] *Díaz Lizardi v. Aguayo Leal*, 162 D.P.R. 801, 815 (2004); *Ortiz Andújar v. E.L.A., supra*, a la pág. 823, *citando a* J. Santos Briz, *Comentarios al Código Civil y Compilaciones Forales*, (dirigido por M. Albaladejo), Madrid, Ed. Rev. Der. Privado, 1984, Tomo XXIV, 1984, págs. 27-28.

[44] *E.L.A. v. Cole*, 164 D.P.R. 608, 633 (2005).

[45] *Íd. Véase además, Plan de Bienestar Salud v. Alcalde Cabo Rojo*, 114 D.P.R. 697, 703 (1983).

[46] *Íd.*

Reglas de Procedimiento Civil disponen que "[l]as determinaciones de hechos basadas en testimonio oral no se dejarán sin efecto a menos que sean claramente erróneas, y se dará la debida consideración a la oportunidad que tuvo el tribunal sentenciador para juzgar la credibilidad de los testigos".[47] Debe brindársele gran deferencia al juzgador de los hechos, pues éste se encuentra en mejor posición para evaluar y adjudicar la credibilidad de un testigo.[48] En ausencia de error, prejuicio o parcialidad, los tribunales apelativos no intervendrán con las determinaciones de hechos, con la apreciación de la prueba ni con la adjudicación de credibilidad efectuadas por el foro primario.[49]

En cuanto a la imposición de honorarios por temeridad, las Reglas 44.1(d) y 44.3(b) de Procedimiento Civil autorizan la condena al pago de honorarios de abogado e intereses por temeridad.[50] Además, establecen que su imposición depende exclusivamente de la determinación que haga el magistrado que presidió el proceso, respecto a si la parte perdedora, o su abogado, actuaron en forma temeraria o frívola. Una vez determinada la temeridad, la imposición de

---

[47] 32 L.P.R.A. Ap. III, R. 43.2.

[48] *Trinidad v. Chade*, 153 D.P.R. 280, 291 (2001).

[49] *Íd.*

[50] 32 L.P.R.A. Ap. III, R. 44.1(d) y 44.3(b).

una suma razonable de honorarios de abogado por temeridad es imperativa.[51]

La condena al pago de honorarios de abogado e intereses por temeridad tiene como propósito "establecer una penalidad a un litigante perdidoso que por su terquedad, obstinación, contumacia e insistencia en una actitud desprovista de fundamentos, obliga a la otra parte, innecesariamente, a asumir las molestias, gastos, trabajo e inconveniencias de un pleito".[52]    La determinación sobre si una parte ha procedido con temeridad descansa en la sana discreción del tribunal.[53]

Los tribunales apelativos no deben intervenir con el ejercicio de discreción del juzgador de hechos a menos que esté presente un error manifiesto en la apreciación de la prueba o que el foro primario actuara con pasión, prejuicio o parcialidad.    Los foros apelativos podrán intervenir cuando el Tribunal de Primera Instancia haya errado en la interpretación o aplicación de cualquier norma procesal o de derecho sustantivo, para evitar perjuicio sustancial.[54]

## II

¿Existía un contrato entre Santiago y Danosa para realizar la obra objeto de la segunda orden de cambio?    Para

---

[51] *Fernández v. San Juan Cement Co., Inc.,* 118 D.P.R. 713, 717 (1987).

[52] *Íd.,* a la pág. 718.

[53] *Ramírez v. Club Cala de Palmas*, 123 D.P.R. 339, 349 (1989).

[54] *Lluch v. España Service Station,* 117 D.P.R. 729, 745 (1986).

contestar esta interrogante debemos determinar si en el presente caso concurren los requisitos para la existencia de un contrato, a saber: objeto, consentimiento y causa. Veamos.

El 12 de octubre de 2001, Santiago y Danosa perfeccionaron un contrato de ejecución de obras. En el referido contrato Danosa se obligó a realizar el techado del Coliseo, mientras que Santiago se obligó a pagarle el precio de $145,774.00. Este contrato fue modificado en dos (2) ocasiones. En la primera, las partes acordaron la orden de cambio número uno (1) y su precio. Asimismo, ambas partes firmaron la referida orden de cambio. En la segunda modificación, hay dos (2) documentos con precios distintos y en ninguno de estos se encuentran las firmas de ambas partes. Ello, a pesar de que la forma para la orden de cambio dispone que el documento no será válido hasta que concurran ambas firmas.

Sin embargo, las partes llegaron a un acuerdo sobre el trabajo del alero del Coliseo antes de que se gestionaran los documentos para la segunda orden de cambio. El 25 de octubre de 2002, Danosa le envió una carta a Santiago en la que hizo referencia a una comunicación anterior para que se cotizara el trabajo del alero del Coliseo. En la aludida carta, Danosa le expresó a Santiago que "[e]speramos comunicación suya y aprobación para poder continuar con este cambio".[55] No obstante, para esa fecha Danosa ya había comenzado los

_____

[55] *Véase*, Apéndice, a la pág. 67.

trabajos en el alero del Coliseo mediante la subcontratación de Cibel.

Pocos días después, el 1 de noviembre de 2002, Santiago le envió una carta a Danosa en la que se refirió a un pacto, pero no a un precio específico. En la referida carta Santiago le confirmó a Danosa el contenido de una conversación telefónica "en relación a los trabajos adicionales de cubrir la parte inferior del alero con el mismo material del techo".[56] Es decir, Santiago le confirmó a Danosa el trabajo en controversia en el caso de autos. De esta forma, ambos acordaron que se realizara trabajo no pactado en el contrato de ejecución de obras para el techado del Coliseo. Así lo manifiestan las expresiones y la conducta de ambas partes. Adviértase, que el 22 de noviembre de 2002, Cibel, subcontratista de Danosa, concluyó el trabajo en el alero del Coliseo y no fue hasta aproximadamente cinco (5) meses después que las partes tramitaron el primer documento para la segunda orden de cambio. Durante el transcurso de ese periodo de tiempo ninguna de las partes manifestó objeción sobre el acuerdo.

Con el beneficio de lo antes expuesto, pasemos a examinar el objeto, el consentimiento y la causa, requisitos del contrato. En el caso ante nos, el *objeto* contractual consiste en la instalación de planchas de metal en el alero del Coliseo. En cuanto al requisito de *consentimiento* de los contratantes, no cabe duda de que Santiago y Danosa acordaron

---

[56] *Véase*, Apéndice, a la pág. 68.

la ejecución del trabajo para el alero del Coliseo. Sin embargo, cabe preguntarse si el aludido acuerdo es suficiente para cumplir con el requisito de *consentimiento* para la existencia de un contrato, según lo exige el Artículo 1214 del Código Civil.[57] De entrada, parecería que el acuerdo de voluntades entre Santiago y Danosa fue suficiente para ello. **No obstante, el consentimiento necesario para que exista un contrato es el que recae sobre el *objeto* y la *causa* que han de constituir el contrato.[58] No basta con que las partes presten su consentimiento sólo respecto al *objeto* o sólo respecto a la *causa*, sino que tienen que consentir a ambos requisitos para que exista un contrato. Sin una oferta completa no puede haber aceptación definitiva que perfeccione un contrato.[59]**

Por lo expuesto, para resolver si se satisface el requisito de *consentimiento*, luego de haber determinado el *objeto* del contrato en el caso ante nos, debemos precisar si se cumple con el requisito de *causa*. Para ello, debemos determinar si se pactó el precio. Veamos.

En la carta enviada por Danosa a Santiago, el 25 de octubre de 2002, Danosa cotizó el trabajo por la cantidad de $63,680.00. Por otra parte, en la carta enviada por Santiago a Danosa, el 1 de noviembre de 2002, la demandada le expresó que "[d]e tener algún inconveniente o rechazo por

---

[57] 31 L.P.R.A. § 3401.

[58] *Íd.*

[59] *Vila & Hnos., Inc. v. Owens Ill. de P.R.*, 117 D.P.R. 825, 834-835 (1986); *Prods. Tommy Muñiz v. COPAN*, 113 D.P.R. 517, 524 (1982).

parte del diseñador en cuanto a este trabajo se refiere, será nuestra responsabilidad los costos que conlleve modificarla".[60] Adviértase, que Danosa estableció el precio por $63,680.00, mientras que Santiago asumió la responsabilidad del costo que conllevara modificar el trabajo, de haber algún inconveniente con el diseñador, sin hacer mención del precio pactado.

Asimismo, el primer documento para la orden de cambio número dos (2) estableció el precio de la obra en $63,680.00, mientras que el segundo documento dispuso el importe de $29,498.60. Sin embargo, ninguno de los referidos documentos contó con la firma de ambas partes, a pesar de así requerirlo expresamente. En síntesis, las expresiones de las partes en relación al precio en controversia se circunscriben a los dos (2) documentos sobre la segunda orden de cambio y a las dos (2) cartas aludidas.

Resolvemos, pues, que de los documentos relacionados a la segunda orden de cambio no surge cuál fue el precio pactado entre las partes. De igual forma, si bien es cierto que las cartas cursadas entre Santiago y Danosa aluden a un costo, no es menos cierto que de estas no surge cuál fue el importe del precio pactado.

El Tribunal de Primera Instancia, quien juzgó directamente la credibilidad de los testigos, determinó que la prueba sobre el contenido de la conversación telefónica sobre el precio fue conflictiva. Por ello, **el foro primario**

---

[60] *Véase*, Apéndice, a la pág. 68.

**expresó que quedó "en duda si en efecto hubo la aprobación del precio según cotizado".**[61]    No obstante, a pesar de reconocer la existencia de este conflicto, el Tribunal de Primera Instancia no lo adjudicó.

A tenor con lo antes expuesto, somos del criterio de que el Tribunal de Primera Instancia debe celebrar una vista para determinar si se pactó el precio de la obra objeto de la segunda orden de cambio, adjudicando credibilidad sobre la prueba ofrecida y admitida para resolver definitivamente el asunto.   De concluir que se pactó el precio, el foro primario fijará la cantidad acordada por las partes como la adeudada por Santiago.   Ello, debido a que el único requisito restante para determinar si se perfeccionó el contrato entre las partes sería el *consentimiento* y éste, en el caso ante nos, depende de la existencia de *causa*.

En cambio, de resolver que no se pactó el precio, entonces no se cumpliría con el requisito de *causa* y, en consecuencia, el acuerdo entre las partes no sería suficiente para que se perfeccione un contrato.   De ese ser el caso, habrá que fijar el aumento de precio a que tiene derecho el contratista determinando cuál es el valor razonable en el mercado de la obra objeto de la segunda orden de cambio al momento en que Danosa finalizó la construcción.

**De conformidad con lo antes expuesto, concluimos que cuando se realiza una orden de cambio sin pactar su precio,**

---

[61] *Véase*, Apéndice, a la pág. 20.   (Énfasis nuestro).

**el criterio para determinar el aumento de precio según el Artículo 1485 del Código Civil, *supra*, es el valor razonable de la obra en el mercado al momento en que el contratista finaliza el trabajo y no meramente el costo de los materiales y de la mano de obra según Zequeira, *supra*. Así pues, el contratista con derecho a recobrar el valor razonable de la obra no está limitado a los costos en que haya incurrido, sino que puede recuperar el valor razonable en el mercado de la obra requerida. El valor razonable de la obra en el mercado es el costo de los materiales y de la mano de obra al momento en que el contratista finaliza la construcción, más una ganancia para el contratista por la obra realizada.**

**En otras palabras, el valor razonable de la obra en el mercado es la cantidad que costaría obtener dicha obra de otro contratista en la posición del demandante al momento en que la obra fue terminada.** Resolver lo contrario avalaría la injusticia que surge cuando un contratista realiza una obra para otra persona sin pactar precio alguno y lo único que recibe como remuneración son los costos en los cuales incurrió para realizar dicha obra, sin tener derecho a reclamar ganancia alguna por su trabajo.

Según expuesto, en *Salgado*, *supra*, atendimos la aludida controversia bajo el Artículo 1473 del Código Civil[62] y resolvimos que el criterio para fijar el importe era el valor razonable de los servicios prestados. Sin embargo, en

---

[62] 31 L.P.R.A. § 4111.

*Zequeira*, *supra*, atendimos la misma controversia que en *Salgado*, *supra*, pero bajo el Artículo 1485 del Código Civil[63] y concluimos que el criterio para determinar el aumento en precio era el costo incurrido en la mano de obra y en los materiales, acordados en el pacto original, advirtiendo la diferencia de ese costo con el nuevo acuerdo.[64]

Como puede apreciarse, en ambos casos resolvimos la misma controversia de forma distinta, bajo dos (2) artículos del Código Civil.  Existen ciertas diferencias entre el Artículo 1473 y el Artículo 1485 del Código Civil.

El Artículo 1473, *supra*, expresamente dispone el importe razonable como el criterio a utilizarse para fijar el precio de los servicios prestados, en aquellos casos en que no se haya pactado su remuneración.  Por su parte, el Artículo 1485, *supra*, dispone que el contratista puede pedir un aumento de precio por un cambio en los planos que

---

[63] 31 L.P.R.A. § 4126.

[64] *Zequeira v. Municipal Housing Authority*, *supra*, a las págs. 884-886 (1961).  No puede perderse de perspectiva el contexto en que la norma de *Zequeira* fue establecida. *Zequeira* fue resuelto en la década del sesenta del siglo XX, época en la que gran parte de la construcción era promovida por el Estado y en la que **imperaba la noción de que el contratista tenía que soportar la mayoría de los riesgos asociados a un proyecto de construcción.** *Véase*, Weinstein-Bacal and Parces-Enríquez, *Construction in Puerto Rico: Navigating the Legal Quagmire*, 71 Rev. Jur. U.P.R. 29 (2002), a la pág. 30.  Hoy en día, dicha postura ha sido sustituida en la industria de la construcción por la noción de que los riesgos deben ser compartidos entre las partes contratantes.  *Íd.*  Así pues, los dueños de obras, contratistas y subcontratistas han logrado mejorar sus prácticas contractuales para garantizar el tráfico ordenado de sus relaciones jurídicas y, de esa manera, tratar de evitar las controversias derivadas de los proyectos de construcción.  *Íd.*, a las págs. 29 y 30.

produzca a su vez un aumento de obra, siempre que el propietario hubiese dado su autorización.[65]

La diferencia entre el arrendamiento de servicios y el de ejecución de obra reside en que, en el primero la prestación está constituida por el servicio en sí, mientras que en el segundo, "la prestación está representada por el "resultado", sin que importen para nada las horas de trabajo, es decir, el servicio".[66] En el contrato de servicios las partes pretenden lograr que otra persona desarrolle cierta actividad, "mientras en el de obra persiguen, no estrictamente esa actividad ajena, sino su resultado".[67] Así pues, "en los contratos de servicios se prestaría el medio, es decir, el trabajo; la actividad profesional o manual, con independencia del resultado".[68] No obstante "la distinción se hace difícil en muchos supuestos en los que el servicio produce un resultado material".[69]

En lo que a este Tribunal respecta, no encontramos justificación para mantener dos (2) interpretaciones distintas sobre la misma controversia, dependiendo del artículo del Código Civil que se invoque. Ello atenta

---

[65] El Artículo 1485, *supra*, no menciona cómo se determinará el referido aumento de precio. *Zequeira, supra,* suplió ese vacío ante la realidad de la época en que se resolvió, pero ciertamente tiene el efecto de crear inestabilidad en nuestro ordenamiento jurídico.

[66] Miguel A. Del Arco y Manuel Pons, *Derecho de la Construcción*, Madrid, Ed. Hesperia, 2da ed., 1980, pág. 23.

[67] *Íd.*, a la pág. 24.

[68] *Íd.*

[69] *Íd.*

contra la seguridad jurídica y puede conducir al desatino inadmisible de decisiones inconsistentes sobre asuntos similares.

Entendemos que el problema ha residido en que los tribunales han atendido y resuelto controversias relacionadas a órdenes de cambio bajo la normativa del contrato de servicios profesionales y no bajo los preceptos del contrato de ejecución de obras. Si bien es cierto que con una orden de cambio se busca un servicio, no es menos cierto que éste es sólo el medio para la obtención de un resultado, que es precisamente lo que se busca con un contrato de ejecución de obras. Por ello, lo jurídicamente correcto es atender y resolver las controversias que emerjan al no pactarse el importe del precio de una orden de cambio, a tenor con el Artículo 1485 del Código Civil, *supra*.

Lo aquí resuelto promueve la seguridad del ordenamiento jurídico y se atempera a la realidad vigente. Además, adelanta los fines de la justicia en la medida en que, **a falta de convenio sobre el precio del trabajo producto de una orden de cambio, lo justo es que el contratista obtenga el valor razonable en el mercado de la obra requerida y ejecutada.** Adviértase, que bajo el criterio de *Zequeira*, *supra*, el contratista resulta perjudicado cuando no se pacta el precio de una orden de cambio, pues para recobrar el aumento de precio sólo tiene derecho a percibir el costo de los materiales y de la mano de obra sin poder reclamar ganancia alguna por la ejecución de la obra que constituye la orden de cambio.

Por lo antes expuesto, revocamos en parte el caso de *Zequeira, supra,* en cuanto resuelve que cuando se pacta una orden de cambio sin acordar el importe, el criterio para determinar el aumento de precio es el valor de la obra ejecutada determinado sólo por el costo de los materiales y de la mano de obra. Resolvemos, pues, que el criterio para determinar el aumento de precio a que tiene derecho el contratista según el Artículo 1485 del Código Civil, *supra*, es el valor razonable en el mercado de la obra producto de la orden de cambio, según hemos mencionado anteriormente.[70]

En el caso ante nos, en vista de nuestra conclusión de que se cumplió con el requisito de *objeto* para el trabajo de la segunda orden de cambio y de que el requisito de *consentimiento* sólo depende de que se haya llegado a un acuerdo sobre la *causa*, concluimos que el Tribunal de Primera Instancia erró al aplicar la doctrina de enriquecimiento injusto sin antes resolver si se pactó el precio. Asimismo, erró el Tribunal de Apelaciones al determinar que el precio se pactó, conclusión que no tiene apoyo en las determinaciones de hechos formuladas por el Tribunal de Primera Instancia, por no haberse dirimido por el foro primario los conflictos de prueba presentes ante sí sobre tal punto.

El Tribunal del Primera Instancia concluyó que Danosa fue temeraria al insistir en que se le pague todo lo que

---

[70] Nótese, que no se trata aquí del aumento de valor en la propiedad del demandado por concepto de la obra realizada, sino del valor razonable en el mercado de la obra requerida y realizada.

reclama, a pesar de reconocer la falta de firmas en el contrato escrito para validar la segunda orden de cambio. Por esta razón, el foro primario le ordenó a Danosa el pago de $2,000.00 en concepto de honorarios de abogado.

Por su parte, el Tribunal de Apelaciones eliminó la partida de honorarios de abogados al concluir que Danosa no fue temeraria. El foro apelativo intermedio entendió que la demandante litigó de buena fe, amparándose en lo que creyó correcto.

En el caso de marras, en vista de nuestra conclusión de que el Tribunal de Primera Instancia erró al no adjudicar si se pactó el precio de la obra en controversia, no procede la condena sobre el pago de honorarios de abogado cuando, precisamente, el reclamo de la demandante es que se le pague el precio que estimó fue pactado. La determinación de temeridad no puede sostenerse ante tales circunstancias.


*Efraín E. Rivera Pérez*
*Juez Asociado*

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Danosa Caribbean, Inc.

    Demandante-Recurrido

          v.

Santiago Metal Manufacturing
Corp., Juan del Pueblo XYZ,
Inc.

    Demandada-Peticionaria

CC-2008-882

Opinión Concurrente emitida por el Juez Asociado señor MARTÍNEZ TORRES.

En San Juan, Puerto Rico, a 19 de mayo de 2010.

Concurro con la sentencia que emitimos en este caso. Procede devolver el caso al Tribunal de Primera Instancia para que determine si entre las partes hubo un acuerdo sobre el precio de la obra. Si no hubo un acuerdo sobre el precio, entiendo que procede adjudicar la controversia al amparo de la doctrina sentada en Zequeira v. CRUV, 83 D.P.R. 878 (1961).

I

Surge con claridad del expediente que el cambio de obra fue pactado por las partes. No obstante, no contamos con esa claridad sobre el hecho de si se

pactó el precio, cuestión medular en la presente controversia. En su sentencia, el Tribunal de Primera Instancia afirmó que quedó "en duda si en efecto hubo la aprobación del precio según cotizado" pero no adjudicó ese conflicto de la prueba. Apéndice del recurso, pág. 20. Ante esto, difiero de la Opinión disidente del Juez Presidente señor Hernández Denton, pues parte de una premisa incorrecta.

Es necesario adjudicar si se aprobó o no el precio según cotizado. Esta adjudicación constituye un hecho esencial que nos impide adjudicar la controversia ante nos. Ese hecho es vital para determinar si aplica Zequeira v. CRUV, supra, o no. Ya que la prueba documental es conflictiva sobre este extremo, era deber del foro primario dirimir los testimonios de los testigos para adjudicar este hecho. Sabido es que la apreciación de la prueba que realiza el foro primario es esencial pues éste tiene la oportunidad de adjudicar la credibilidad de los testigos. Ramírez Ferrer v. Conagra Foods PR, Op. de 14 de abril de 2009, 2009 T.S.P.R. 55, 2009 J.T.S. 58, 175 D.P.R. ___ (2009); Trinidad v. Chade, 153 D.P.R. 280 (2001). Los foros apelativos sólo tenemos "récords mudos e inexpresivos". Pérez Cruz v. Hosp. La Concepción, 115 D.P.R. 721, 728 (1984); López v. Hosp. Presbiteriano, Inc., 107 D.P.R. 197, 225 (1978), Op. disidente del Juez Asociado Señor Irizarry Yunqué. Nos es imposible determinar si se pactó un precio para el cambio de orden o no.

En el caso de que el foro primario determiné que se pactó el precio, es de aplicación el principio contractual de *pacta sunt servanda* que obliga a las partes a cumplir con lo pactado. Art. 1044 del Código Civil, 31 L.P.R.A. sec. 2994. Véase además, BBPR v. Sucn. Talavera, Op. de 31 de julio de 2008, 2008 T.S.P.R. 132, 2008 J.T.S. __, 174 D.P.R. __ (2008).

Sin embargo, en el caso de que el precio no haya sido pactado es de aplicación la norma de Zequeira v. CRUV, supra. Esta norma establece que cuando en un contrato de obras hay un cambio de orden sin que se haya pactado el precio de dicho cambio, es necesario ajustar el precio a base del aumento en precio o el costo adicional. El *quantum meruit* o valor razonable se utiliza cuando se trata de una obligación implícita que surge cuando no existe un contrato válido entre las partes. Ibíd.

En Zequeira, descartamos la aplicación de la norma de valor razonable o *quantum meruit* y aplicamos el aumento en precio o el costo adicional. Al así decidir, afirmamos que "[a] primera vista, parece que se trata de la misma cosa, pero no lo es". Id., pág. 884. Para aplicar la doctrina de aumento en precio debe establecerse: (1) el costo de mano de obra y de materiales del contrato original; y (2) el costo de la obra con el cambio de orden. Id., pág. 855. La diferencia entre ambos costos equivale al aumento en precio o costo adicional al que tendrá derecho el contratista.

Esta doctrina se sustenta en que las partes ya han convenido la ganancia del contratista en el contrato de obra original, y que implícitamente, mantienen esta ganancia inalterada cuando acuerdan un cambio de orden sin fijar un precio distinto. El valor razonable o *quantum meruit* deja de ser eficaz en estos casos, pues a diferencia de cuando no existe un contrato válido, en los casos de cambios de orden existe ya la voluntad de las partes a determinado precio y a una ganancia. Claro está, esto procede si las partes no pactan un precio distinto para el cambio de orden.

Por los fundamentos antes expuestos, concurro con la Sentencia del Tribunal que devuelve el caso al Tribunal de Primera Instancia para que determine si las partes acordaron un precio para el cambio de orden o no. Sin embargo, ordenaría que en el caso en que se determine que no se pactó un precio para el cambio de orden es de aplicación la doctrina de aumento en precio o costo adicional.

RAFAEL L. MARTÍNEZ TORRES
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Danosa Caribbean, Inc.

    Recurridos

        v.

                                 CC-2008-882

Santiago Metal Manufacturing,
Corp., Juan del Pueblo XYZ,
Inc.

    Peticionario

Voto disidente emitido por la Juez Asociada señora Rodríguez Rodríguez al que se une la Jueza Asociada señora Fiol Matta

San Juan, Puerto Rico, a 19 de mayo de 2010

Disiento porque es mi criterio que el foro intermedio no erró al resolver que, en el presente caso, se configuró una aceptación tácita en relación con el precio cotizado. No procedía, por tanto, revocar la sentencia recurrida.

I.

Danosa Caribbean, Inc.[71] (Danosa) presentó una demanda sobre cobro de dinero contra Santiago Metal Manufacturing, Corp. (Santiago Metal). Reclamó de este último la suma de $110,339.85 y arguyó que era

---

[71] Danosa Caribbean, Inc. presentó la reclamación como sucesora de Danosa Metal Roofing, Corp.

acreedor de ese pago por haber realizado unos trabajos en el Coliseo de San Sebastián (Coliseo). Posteriormente, Santiago Metal consignó ciertas sumas de dinero para satisfacer el pago correspondiente a parte de los trabajos que Danosa realizó. Así, la controversia pendiente ante el Tribunal de Primera Instancia se redujo a determinar el pago del cual era acreedora Danosa por la instalación de un plafón en el perímetro exterior del Coliseo. No estuvo en controversia que Danosa realizó los trabajos en cuestión. Las partes, sin embargo, no lograron acordar la suma adeudada. Específicamente, Danosa reclamó que Santiago Metal le adeudaba $63,680. A continuación exponemos los hechos relacionados con esa reclamación y con la controversia traída ante la consideración de este Tribunal.

En el 2001, Danosa fue contratada por Santiago Metal, para el techado del Coliseo, por el precio de $145,774. Posteriormente, Santiago Metal preparó para Vissepó & Diez, contratista general del proyecto, una cotización referente a la instalación del "soffit"[72] en todo el perímetro de la parte exterior de las ventanas del Coliseo. La cotización preparada por Santiago Metal para Vissepó & Diez indicaba que la instalación del "soffit", empleando el mismo "standing seam" utilizado para el techado del edificio, tendría el precio de $29,464. Dicha cotización fue preparada con fecha del 9 de agosto de 2002.

---

[72] Las partes utilizaron este término para referirse a la labor de cubrir la parte inferior del alero del Coliseo.

Sobre la preparación de esa cotización testificó ante el Tribunal de Primera Instancia el Sr. Luis Armando Santiago, quien estaba a cargo de administrar la fase de diseño y obras por parte de Santiago Metal. Según especificó el foro primario en su sentencia, de ese testimonio, el cual le mereció entera credibilidad, surgió que el Sr. Luis Armando Santiago cotizó la suma de $29,464 para la instalación del "soffit", porque entendió que el trabajo era "más simple". Para calcular el precio cotizado éste consideró que el costo total de los trabajos realizados en el techo, cuya área era de 15,191 pies cuadrados, ascendió a $145,774, mientras que el trabajo en el "soffit", cubriría un área aproximada de 2,000 pies cuadrados. El Sr. Luis Armando Santiago preparó esa cotización con el objetivo de someterla para la aprobación de Vissepó & Diez, pues éste último le presionaba para evitar las penalidades que implicaría una demora en completar la obra.

Luego de que se envió la referida cotización, Danosa preparó, por petición de Santiago Metal, una cotización sobre la instalación del "soffit" en el proyecto de referencia. Mediante carta, fechada el 25 de octubre de 2002, Danosa le comunicó a Santiago Metal que el precio por "el suplido e instalación del 'soffit' cubierto en planchas metálicas color cobre" era $63,680. Además, en esa carta, Danosa le informó a Santiago Metal que en relación con el trabajo adicional cotizado, el próximo día sábado 26 de

octubre, comenzaría los trabajos de la muestra "para la aprobación del dueño", según le había sido requerido. Le indicó también que esperaría su ulterior comunicación y aprobación para continuar con el cambio, y que, de surgir cualquier duda, se comunicara a sus oficinas inmediatamente. El foro primario determinó que, cuando Danosa envío esa carta, ya había iniciado los trabajos del "soffit", y para ello, subcontrató la mano de obra.

De otra parte, el Tribunal de Primera Instancia estableció que, tras dicha comunicación, Santiago Metal le envió una carta a Danosa, con fecha del 1 de noviembre de 2002, en la cual aludió a una conversación telefónica relacionada con los trabajos del "soffit". En esa carta, el Sr. Luis Armando Santiago se limitó a indicarle a la Sra. Lee Rivera, representante de Danosa, lo siguiente:

> Según conversación telefónica, le confirmo la misma, en relación a los trabajos adicionales de cubrir la parte inferior del alero con el mismo material de techo. De tener algún inconveniente o rechazo por parte del diseñador en cuanto a este trabajo se refiere, será nuestra responsabilidad los costos que conlleve modificarla.
> Sin nada más al respecto, quedo de usted.
> Luis A. Santiago

El Tribunal de Primera Instancia determinó que la prueba relativa al contenido de la conversación telefónica, a la cual se alude en dicha carta, fue conflictiva y, por tanto, quedó en duda si en efecto Santiago Metal aprobó el precio según cotizado por Danosa. No obstante, dicho foro entendió probado que el interés común de Santiago Metal y Danosa era concluir la obra a tiempo. A finales de

noviembre de 2002 ya se habían concluido los trabajos del "soffit".

Meses después, Santiago Metal le envió a Danosa un documento, con fecha del 3 de abril de 2003, identificado como "Change Order #2". El documento incluía la cifra de $63,680 como el costo por la ejecución de los trabajos adicionales en el "soffit". No obstante, ese documento sólo contaba con la firma de Lee Rivera, representante de Danosa, y advertía que sólo sería válido si estaba suscrito por ambas partes.

Posteriormente, Santiago Metal le envió a Danosa un documento adicional, con fecha del 23 de abril de 2003, también identificado como "Change Order #2" y referente a los mismos trabajos de la instalación del "soffit". Ahora bien, este documento incluía un precio total de $29,047.10, y sólo estaba firmado por Milton Santiago, representante de Santiago Metal. Al igual que el documento anterior, éste expresamente requería la firma de ambas partes contratantes para su validez.

El Tribunal de Primera Instancia expuso que ninguno de los documentos preparados por Santiago Metal, e identificados como "Change Order #2", contaban con la firma de ambas partes contratantes y que, por tanto, ninguno era vinculante para éstas. Además dicho foro razonó que Danosa inició los trabajos antes de que se prestara el consentimiento necesario, e inclusive antes de haber sometido su cotización, por lo que asumió el riesgo de que

ésta fuese rechazada. Expuso que Santiago Metal también asumió un riesgo al haber enviado una orden de cambio con un precio erróneo y luego haber intentado subsanar ese error con un nuevo documento de orden de cambio, sin que lograra obtener la confirmación de Danosa para esa reducción. Así, el foro primario determinó que en el afán por terminar la obra a tiempo, ambas partes asumieron riesgos.

Concluyó que, en ausencia de una obligación vinculante, Danosa no podía exigirle a Santiago Metal que pagara más del doble del precio que este último recibió del contratista general. El tribunal entendió que Santiago Metal, mediante el testimonio del Sr. Luis Armando Santiago, justificó los cómputos realizados para su cotización y que, por el contrario, Danosa no ofreció una explicación razonable para justificar el precio reclamado. Resolvió que, al amparo de la doctrina de enriquecimiento injusto, procedía que Santiago Metal le pagara a Danosa una suma igual al pago que recibió, es decir $29,498.60.

De otra parte, determinó que Danosa actuó temerariamente por mantenerse en su posición de reclamar los $63,680, a pesar de la ausencia de un acuerdo vinculante al respecto.

Danosa acudió ante el Tribunal de Apelaciones y adujo, en síntesis, que el Tribunal de Primera Instancia erró: al resolver que no existió obligación vinculante para las obras del "soffit", al aplicar en su contra la doctrina de

actos propios, y al determinar que fue temerario en el curso de los procesos. Danosa argumentó que, a pesar de conocer el precio de la cotización, Santiago Metal permitió que iniciara y concluyera los trabajos adicionales sin cuestionar el precio cotizado y que, por tanto, aceptó tácitamente la cotización. El foro intermedio acogió el argumento esbozado por Danosa a los efectos de que Santiago Metal consintió al menos tácitamente a la ejecución de la obra según fue ofrecida y cotizada. Consecuentemente, revocó la sentencia apelada y le impuso a Santiago Metal el pago de $63,680. Además, revocó la determinación del foro primario de que Danosa actuó de forma temeraria.

Inconforme, Santiago Metal acudió ante este Foro mediante recurso de *certiorari*. Argumenta que el foro intermedio erró al resolver que hubo un contrato válido entre las partes y descartar así la aplicación de la doctrina de enriquecimiento injusto. Indica además que, al resolver lo anterior, el Tribunal de Apelaciones intervino indebidamente con la apreciación de la prueba del Tribunal de Primera Instancia. Arguye que, en ausencia de un precio convenido, no existía un contrato entre las partes y que, por tanto, el Tribunal de Primera Instancia aplicó adecuadamente la doctrina de enriquecimiento injusto.

Por su parte, Danosa argumenta que realizó los trabajos del "soffit" bajo la creencia de que su cotización fue aceptada, toda vez que Santiago Metal no le cuestionó el precio cotizado. Así, sugiere que Santiago Metal aceptó

tácitamente el precio de $63,680 mediante su "silencio" y la ausencia de objeción al respecto.

Tras examinar los hechos que originaron la presente controversia, es mi criterio que el foro intermedio no erró al resolver que Santiago Metal aceptó, al menos tácitamente, el precio cotizado por Danosa. Por tanto, no estoy conforme con devolver el caso al foro primario para que éste adjudique si las partes convinieron un precio, en relación con la orden de cambio. Antes de exponer los fundamentos para ello, estimo pertinente distinguir entre el requisito de precio cierto en un contrato de ejecución de obra perfeccionado por aplicación del artículo 1434 del Código Civil, *infra*, y los elementos necesarios para que se configure una novación modificativa en virtud del artículo 1485 del Código Civil, *infra*. Particularmente, la controversia ante nuestra atención versa sobre el aumento en precio al que tiene derecho el contratista, en el contexto de una novación modificativa al amparo de este último artículo. Veamos.

II.
A.

El artículo 1434 del Código Civil, 31 L.P.R.A. sec. 4013, establece que mediante un contrato de ejecución de obra, una parte se obliga a ejecutar una obra a cambio de un precio cierto.[73] Así, en este contrato en particular, a

---

[73] Dicho artículo define, además, el contrato de arrendamiento de servicios como aquel en el que una parte se obliga a prestar unos servicios a cambio de un precio cierto. En éste contrato en particular se promete "la prestación de los servicios en sí mismos". Manuel

cambio de la contraprestación denominada precio cierto, una parte se compromete a un resultado: la obra realizada. Manuel Albaladejo, *Derecho Civil: Derecho de Obligaciones*, 8va ed., Barcelona, Librería Bosch, 1989, T. II, Vol. II, pág. 299. Tales prestaciones conforman el objeto contractual.

En relación con la prestación denominada como precio cierto, Albaladejo explica que "[e]l precio unas veces se determina concretamente en el propio contrato. . ., pero otras no se expresa". *Op. cit.*, pág. 301. En caso de que el precio no se establezca concretamente, aún el contrato sería válido "con tal de que el precio pueda ser fijado por uso o costumbre, por tarifas adecuadas, por tasación pericial, etc.". *Íd.* Para Albaladejo, la doctrina jurisprudencial que avala la fijación del precio por parte de los tribunales, puede sustentarse bajo el razonamiento de que las partes adoptaron implícitamente "el precio usual para el tipo de obra o servicio que sea, o acordaron aceptar el que resultase ser el corriente o el de la tarifa o el de tasación, etc...". *Íd.,* pág. 303. *Véase además,*

---

Albaladejo, *Derecho Civil: Derecho de Obligaciones*, 8va ed., Barcelona, Librería Bosch, 1989, T. II, Vol. II, págs. 299-300. Tal distinción es importante puesto que al contrato de arrendamiento de servicios y al de ejecución de obra le aplican distintos preceptos. *Íd.* Cuando se promete la prestación de un servicio, aplica el artículo 1473 del Código Civil, 31 L.P.R.A. sec. 4111, en virtud del cual la ausencia de precio no implica la invalidez de la relación contractual, pues la cuantía "puede ser establecida posteriormente por la costumbre o los usos de la profesión". *Ramírez, Segal & Latimer v. Rojo Rigual,* 123 D.P.R. 161, 173 (1989), citando a Puig Brutau, *Fundamentos del Derecho Civil,* 2da ed. rev., Barcelona, Ed. Bosch, T. II, Vol. II, págs. 434-436.

José Cuevas Segarra y Antonio Román García, *Los Contratos Especiales: Puerto Rico y España*, Pub. JTS, 1998, pág. 186.

Por su parte, Antonio García Conesa discute que el factor de precio cierto en el contrato de ejecución de obra debe determinarse por la autonomía y el acuerdo de las partes contratantes. Antonio García Conesa, *Derecho de la Construcción*, Barcelona, Bosch, 1996, págs. 179-180. De ordinario, en dichos contratos, el precio se fija *ab initio*. *Íd.* pág. 181. Particularmente, en la modalidad del contrato de ajuste alzado, "la propia idiosincrasia del convenio impone, como *condictio sine qua non*, su absoluta certeza en el mismo momento de la perfección, de modo que, sin precio definitivo, cerrado e invariable, no existirá ajuste alzado". *Íd.* Ahora bien, expone García Conesa que en los demás tipos del contrato de ejecución de obra existe una tolerancia mayor, cristalizada en el hecho de que "puede no haber precio inicial, sin que de ello se derive la inexistencia o nulidad del acuerdo, porque su importe, antes o después, terminará por concretarse". *Íd.*

La discusión que antecede sugiere que un contrato de ejecución de obra puede ser válido, aún en ausencia de precio concretamente establecido. Aunque tal afirmación puede ser objeto de gran debate, la controversia ante nuestra consideración no requiere resolver si puede existir un contrato de ejecución de obra en ausencia de un precio concretamente establecido, ni mucho menos adoptar una posición sobre tal aspecto.

Los hechos del caso ante nuestra consideración no versan sobre si se perfeccionó un contrato de ejecución de obra entre Danosa y Santiago Metal, dependiendo de si éstos concretizaron un precio. No está en controversia que entre Danosa y Santiago Metal se perfeccionó un contrato de ejecución de obra, cuando el primero se comprometió a ejecutar el techado del Coliseo por el precio de $145,774.

La controversia se circunscribe, más bien, a resolver si las partes convinieron una novación modificativa, al amparo del artículo 1485 del Código Civil, *infra*, en virtud de la cual Danosa tiene derecho a reclamar un aumento del precio acordado en el contrato original. De haberse configurado tal novación, entonces debía dilucidarse el aumento el precio al cual Danosa tendría derecho en virtud del citado artículo. Así, lo adecuado es examinar los requisitos para la aplicación del artículo 1485 del Código Civil, *infra*, así como el alcance del aumento en precio que éste permite.

B.

Una vez perfeccionado un contrato de ejecución de obra por ajuste alzado es de aplicación el principio de invariabilidad del precio prescrito en el artículo 1485 del Código Civil, 31 L.P.R.A. sec. 4126. Este artículo dispone que el contratista que se encarga de ejecutar una obra por un ajuste alzado no puede "pedir aumento de precio aunque se haya aumentado el de los jornaleros o materiales. . .[salvo que] se haya hecho algún cambio en el plano que

produzca aumento de obra, siempre que hubiese dado la autorización el propietario". *Íd.* Así, el citado artículo establece una excepción al principio de invariabilidad del precio, que opera en un contrato de ejecución de obra por ajuste alzado, si se ha obtenido "el consentimiento del dueño" para un "cambio de plano" que produzca a su vez un "aumento de obra". Francisco Lucas Fernández, *Comentarios al Código Civil y Compilaciones Forales*, Editorial Revista de Derecho Privado, 1986, T. XX, Vol. II, págs. 392-393.

Esta excepción al principio de invariabilidad de precio requiere primeramente de un cambio de plano. Francisco Lucas Fernández explica que el elemento de cambio en el plano debe entenderse "en sentido amplio como una alteración –variación–, cambio o modificación del proyecto tenido en cuenta para la fijación del precio originario". *Íd.*, pág. 393. *Véase además*, García Conesa, *op. cit.*, pág. 202. El cambio de plano debe implicar, a su vez, un aumento en la obra el cual constituye "una realidad física que consiste en la diferencia de cuerpo de construcción, que existirá a favor de la edificación terminada sobre la convenida al celebrar el contrato...". García Conesa, *op. cit.*, pág. 205.

De otra parte, en cuanto al elemento del consentimiento del comitente, se interpreta que éste puede prestarse verbalmente o por escrito e incluso de forma tácita. Francisco Lucas Fernández, *op. cit.*, pág. 397. *Véase además*, García Conesa, *op. cit.*, pág. 203. Aunque

dicho consentimiento normalmente se manifiesta previo al inicio de la ejecución del aumento, en cuyo caso reviste la forma de "autorización", puede prestarse con posterioridad a su ejecución, en la forma de "aprobación". Francisco Lucas Fernández, *op. cit*, pág. 396. *Véase además García Conesa*, *op. cit.*, pág. 203.

En suma, para que aplique la excepción prescrita en el artículo 1485 del Código Civil, *supra*, deben coexistir los siguientes hechos: a) cambio de plano; b) consentimiento del comitente; c) el aumento en la obra. Si se satisfacen los requisitos antes mencionados, entonces el contratista puede reclamar un aumento de precio en relación con el contrato original de ejecución de obra. Tal variación, según explica Francisco Lucas Fernández, es interpretada, en general, "como [una] simple modificación de la obligación [original] sin extinguirla. . .". *Op. cit.*, págs. 400-401.

De lo anterior podemos colegir que, luego de que se perfecciona un contrato de ejecución de obra por ajuste alzado, podría configurarse una novación modificativa si las partes contratantes acuerdan un cambio en el plano, aunque el precio que implica tal variación no se haya concretizado inicialmente. *Véase, Zequeira v. C.R.U.V.,* 83 D.P.R. 878 (1961). El cumplimiento con los tres requisitos antes mencionados es suficiente para que se configure una novación modificativa en relación con el contrato de ejecución de obra original y para que, como consecuencia de

ello, el contratista tenga derecho a reclamar un incremento en el precio. *Íd. Véase además*, García Conesa, *op. cit.*, pág. 201. La consecuencia jurídica de lo anterior sería una variación en el precio inicialmente fijado, configurándose una nueva contraprestación total que deberá satisfacer el comitente. García Conesa, *op. cit.*, pág. 184. Como tal obligación surge de una novación modificativa, amparada en el artículo 1485 del Código Civil, *supra,* resulta innecesario acudir a la doctrina de enriquecimiento injusto, como fuente obligacional, para determinar el incremento en precio al que tiene derecho el contratista.

El problema central consiste en interpretar el artículo 1485 del Código Civil, *supra,* para determinar el aumento en precio al cual se tiene derecho en virtud de éste. Al respecto García Conesa expone que el aumento en precio al que tiene derecho el contratista será el convenido por las partes "en el compromiso original o, en su defecto, en otro posterior, y su abono le corresponderá, en defecto de acuerdo, al comitente, siempre que preste su consentimiento". *Op. cit.*, págs. 209-210.

Al examinar si el aumento en precio quedó establecido por convenio entre las partes, cabría incluso considerar la posibilidad de que el comitente consienta tácitamente al precio propuesto por el contratista. Sobre el consentimiento tácito, en *Teachers Annuity v. Soc. Gananciales*, 115 D.P.R. 277, 290, (1984), expusimos que

éste es producto de "la conducta de la persona y no [de] las palabras que utilice", cuando tal conducta y los hechos acaecidos revelan "inequívocamente la voluntad de consentir". Debe pues evaluarse si, a la luz de las circunstancias del caso, tales hechos pueden ser compatibles con otra voluntad. *Íd.* En ese tenor, Lasarte discute que la aceptación tácita se revela a través de hechos "que no dejen lugar a dudas sobre la admisión de las condiciones contractuales ofrecidas". Carlos Lasarte, *Principios del Derecho Civil*, 4ta ed., España, Ed. Trivium, 1996, T. III, pág. 62.

De otra parte, Lasarte expone que la interrogante sobre si el silencio puede interpretarse como asentimiento de la oferta, debe responderse como norma general en la negativa. *Íd.*, págs. 62-63. *Véase además*, Jaime Santos Briz, *Los Contratos Civiles: Nuevas Perspectivas*, Granada, Ed. Comares, 1992, pág. 105. No obstante, el silencio podría implicar la aceptación tácita de una oferta cuando en virtud de una relación previa entre las partes, surge una responsabilidad para quien recibe la oferta de tomar medidas afirmativas para rechazarla. Lasarte*, op. cit.,* pág. 63. Sobre este particular, Lasarte expone lo siguiente:

> Cabe considerar el silencio como declaración de voluntad... cuando dada una determinada relación entre dos personas, el modo corriente de proceder implica el deber de hablar, ya que si el que puede y debe hablar no lo hace se ha de reputar que consiente, en aras de la buena fe (*qui siluit cum loqui et debuit, consentire videtur*). . . porque en tales casos, siendo natural y normal

> manifestar el disentimiento si no se quieren aprobar las propuestas de la otra parte, el silencio sobre las mismas, y más cuando va unido a hechos positivos precedentes, a una actividad anterior de la parte silenciosa o a particulares situaciones subjetivas u objetivas, cabe interpretarlo como tácita manifestación del consentimiento.

*Íd.*, citando a Sentencia de 14 de octubre de 1963 del Tribunal Supremo de España.

De otra parte, Santos Briz distingue que, según la doctrina jurisprudencial, el silencio podría acarrear distintos efectos jurídicos dependiendo de si es un silencio "absoluto" o "cualificado". *Op. cit.*, pág. 106. En caso de un silencio absoluto, sólo se derivaría una expresión tácita de aceptación si por ley se le otorga tal efecto o cuando, en virtud de una relación previa entre las partes, quien calla tenía en cuenta que su silencio sería interpretado "como expresión concluyente de una voluntad de admitir lo manifestado". *Íd.,* págs. 105-106. Cabría, por otro lado, hablar de la eficacia de "un silencio cualificado" cuando éste se une a "hechos positivos precedentes o a otras situaciones que sirvan como elemento útil para tener por hecha la manifestación de una determinada voluntad". *Íd.*

Así, al determinar el aumento en precio al cual tiene derecho el contratista en virtud del artículo 1485 del Código Civil, *supra*, debe examinarse si éste fue objeto de un acuerdo entre las partes. Si por manifestación expresa o tácita el comitente aceptó el precio ofrecido por el contratista, entonces ese precio constituirá la prestación

que el comitente deberá satisfacer. Un acuerdo entre las partes sobre el precio, "aunque sea tardío, si gozara de suficiente claridad, será siempre aceptado como solución preferible a su fijación por otro medio supletorio". García Conesa, *op. cit.*, pág. 182.

Ahora bien, García Conesa expone que cuando los contratantes no acuerden el aumento del precio a satisfacer:

> su determinación, que será el de su valor, más el beneficio industrial, se llevará a término normalmente mediante tasación judicial con apoyo en los medios que obren en autos, y, en su defecto total o parcial, con la inclusión de un cierto arbitrio judicial, por vía de usos o costumbres mercantiles, mediante la prueba pertinente analizada bajo un claro criterio de equidistribución sinalagmática.

*Íd.,* pág. 210.

Así, explica que cuando el tribunal fije el precio, por "tasación" o por medio de "los usos o costumbres mercantiles", deberá incluirse como parte de éste el beneficio industrial, que representa la ganancia profesional del contratista. Aunque dicha ganancia es independiente de los costos de construcción, ésta usualmente se engloba en el precio pactado para la ejecución de la obra. *Íd.,* págs. 185-186. El beneficio industrial del contratista se suma a los costos de construcción, los cuales abarcan los recursos esenciales empleados para la realización de la obra, inclusive los materiales y la mano de obra. *Íd.,* pág. 186, esc. 26.

Si bien tal posición resulta contraria a la norma de *Zequeira* –que excluye el beneficio razonable del contratista del aumento en precio que éste tiene derecho a reclamar– los hechos del presente caso no requerían una expresión de este Foro al respecto. Como expuse anteriormente, es mi criterio que Santiago Metal consintió tácitamente al precio cotizado por Danosa.

III.

Entre Santiago Metal y Danosa se perfeccionó un contrato de ejecución de obra. No está en controversia que, posteriormente, Santiago Metal y Danosa convinieron que esta última se encargaría de la instalación del "*soffit*". Así, ambas partes acordaron un "cambio en el plano" que a su vez implicó un aumento en la obra, configurándose una novación modificativa en relación con el contrato inicialmente pactado. En virtud de esa novación, a Danosa le asiste el derecho a reclamar un aumento en precio, por aplicación del artículo 1485 del Código Civil, *supra*.

Precisamente, la controversia que tuvo ante su consideración el Tribunal de Primera Instancia fue determinar el precio del cual era acreedor Danosa por la instalación del "soffit". Ante ese foro, Danosa reclamó que era acreedor de $63,680 pues ese fue el precio cotizado y el que Santiago Metal aceptó. No se trata de que el foro primario no determinó si se pactó un precio entre Danosa y Santiago Metal, sino que adjudicó esa controversia en la

negativa. Al concluir que de la prueba desfilada quedó en duda si, en efecto, Santiago Metal aprobó el precio, ese foro adjudicó que Danosa no logró probar que en efecto Santiago Metal consintió al precio que aquél cotizó. Partiendo de la premisa de ausencia de precio pactado, el Tribunal de Primera Instancia interpretó que no existía acuerdo vinculante entre las partes y acudió a la doctrina de enriquecimiento injusto para determinar la suma adeudada.

No obstante, al examinar si Santiago Metal aceptó el precio cotizado, el foro primario sólo consideró que el contenido de la conversación telefónica, a la cual se alude en la carta del 25 de octubre de 2002, fue conflictivo y que no pudo determinar si por medio de ésta Santiago Metal aceptó el precio. Igualmente, resolvió que los dos documentos identificados como "Change Order #2" carecían de validez para establecer un acuerdo entre las partes, en cuanto al precio. Ese foro no evaluó si, en virtud de la prueba documental y los hechos que entendió probados, podía determinarse que Santiago Metal aceptó tácitamente la suma cotizada por Danosa.

Es mi criterio que la prueba documental admitida, así como los hechos que el Tribunal de Primera Instancia encontró probados, establecen que Santiago Metal aceptó, al menos tácitamente, el precio cotizado por Danosa. Ello independientemente de que tal aceptación se materializara

luego de que Danosa inició la labor de instalación del "soffit".

Mediante carta, fechada el 25 de octubre de 2002, Danosa le comunicó a Santiago Metal que el precio por la instalación del "soffit" era $63,680. Además, le informó que el próximo día, sábado 26 de octubre, comenzaría los trabajos de la muestra "para la aprobación del dueño", según le había sido requerido. Le indicó también que esperaría su ulterior comunicación y aprobación para continuar con el cambio.

Luego de ello, Santiago Metal le envió una carta a Danosa, con fecha del 1 de noviembre de 2002, en la cual se confirmaba el contenido de una conversación telefónica "en relación a los trabajos adicionales de cubrir la parte inferior del alero con el mismo material de techo". Asimismo, en esa carta, el Sr. Luis Armando Santiago expresó lo siguiente: **"De tener algún inconveniente o rechazo por parte del diseñador en cuanto a este trabajo se refiere, será nuestra responsabilidad los costos que conlleve modificarla. Sin nada más al respecto quedo de usted"**.

Así, luego de que Danosa le envió la cotización a Santiago Metal, informándole que requería de su ulterior comunicación para ejecutar los cambios, continuaron conversaciones entre las partes en relación con la instalación del "soffit". Más aún, Santiago Metal le informó a Danosa que se responsabilizaría de los costos

adicionales que implicara una modificación, en caso de que hubiese que variar el diseño. No está en duda que Santiago Metal y Danosa acordaron que éste último instalaría el "soffit". De los hechos que el Tribunal de Primera Instancia encontró probados no surge que en algún momento un representante de Santiago Metal le informara a Danosa objeción en relación con el precio cotizado. Tal objeción se presentó cuando se envió el segundo documento identificado como "Change Order #2". Previo a ello, el "silencio" que mantuvo Santiago Metal, al no objetar el precio cotizado en el curso de las comunicaciones sobre la ejecución del cambio, unido a sus actos, constituyó una aceptación tácita de la suma cotizada por Danosa.

No se trata de un "silencio absoluto" y ni tan siquiera tenemos ante nuestra consideración un caso en el que el "silencio" de paso al surgimiento de la relación contractual entre las partes. Sino que Santiago Metal prestó el consentimiento para que Danosa instalara el "soffit" sin que expresamente manifestara que aceptó el precio cotizado. Así, luego de que Danosa le informó el precio, Santiago Metal continuó las conversaciones con relación a la ejecución del trabajo sin presentar una objeción al respecto. Tales circunstancias permitieron que Danosa continuara con la ejecución de la obra bajo la creencia de que el precio cotizado fue aceptado. El consentimiento para la ejecución de la obra, en ausencia de objeción sobre el precio cotizado, en unión a los demás

hechos acontecidos, eran reflejo inequívoco de una aceptación por parte de Santiago Metal en relación con el precio propuesto.

En virtud de lo anterior confirmaría la sentencia recurrida.


                              Anabelle Rodríguez Rodríguez
                                    Juez Asociada