# United States Court of Appeals
## For the First Circuit

No. 17-2036

NEREIDA RIVERA-COLÓN,

Plaintiff, Appellant,

v.

AT&T MOBILITY PUERTO RICO, INC.; ÁNGEL COUVERTIER-LÓPEZ;
CARLOS DELIZ; VICTOR PABÓN,

Defendants, Appellees,

COMPANIES X, Y, Z; JANE DOES; JOHN DOES;
INSURANCE COMPANIES A, B, C,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Francisco A. Besosa, U.S. District Judge]

Before

Howard, Chief Judge,
Torruella and Thompson, Circuit Judges.

Rubén T. Nigaglioni, with whom Nigaglioni Law Offices P.S.C.
was on brief, for appellant.
Kenneth W. Gage, with whom Sara B. Tomezsko, Paul Hastings
LLP, José F. Benítez-Mier, Iván Santos-Castaldo, and O'Neill &
Borges LLC were on brief, for appellees.

January 16, 2019

**THOMPSON**, **Circuit Judge**. Nereida Rivera-Colón ("Rivera") filed suit against her former employer, AT&T Mobility Puerto Rico, Inc. ("AT&T"),[1] alleging age discrimination and wrongful termination. After AT&T pulled out its arbitration agreement with Rivera, the district court sent the parties packing to arbitrate. Rivera now asks us to flip the district court's order and allow her to slug it out with AT&T in court. She says that she shouldn't have to arbitrate her claims because she never accepted AT&T's offer to arbitrate legal grievances in the first place. But because we conclude that she manifested her intent to accept the agreement as per Puerto Rico law, we affirm.

## BACKGROUND

We start with a chronicle of the parties' relationship and how they ended up here, diving into some detail (for reasons that will become apparent later).[2]

---

[1] She also sued some of her supervisors, who are the other defendant-appellees, Ángel Couvertier-López, Carlos Deliz, and Victor Pabón. But they raise the same arguments as AT&T, so we just loop them in collectively with their employer, and call them AT&T.

[2] Where, as here, the motion to compel arbitration was made as part of a motion to dismiss or stay, "we glean the relevant facts from the operative complaint and the documents submitted to the district court in support of the motion." Oliveira v. New Prime, Inc., 857 F.3d 7, 9 n.1 (1st Cir. 2017), aff'd, ____ S. Ct. ____, No. 17-340, 2019 WL 189342 (U.S. Jan. 15, 2019).

## A. Rivera's Employment

Their story begins in December 1997, when Rivera (then in her late twenties) began her twenty years' tenure as an employee of AT&T in Puerto Rico. By 2006, she had worked her way up the corporate ladder to become an Assistant Store Manager in AT&T's retail location in Mayagüez, Puerto Rico. There she supervised a small team of employees who sold cell phones, service plans, and all the like. For the majority of her time with AT&T, she says all went well. She consistently received high performance ratings and was praised by her superiors.

But Rivera says everything changed beginning in 2015. Out of the blue, she was transferred from her home base in Mayagüez after twelve years there--even though she had seniority over the other assistant manager, and even though transfers were supposed to be based on seniority. AT&T stationed her at another retail location, this one a kiosk at the Aguadilla Mall, about an hour drive from her home. She says this transfer was really a demotion. The Aguadilla kiosk had lower sales (which means lower commissions), worse hours, and less opportunity for promotion. And, to boot, she says her supervision in Aguadilla was a far throw away from congenial. Now 49 years old, Rivera was supervised by a manager fifteen years her junior who, according to her, placed her on a performance improvement plan for no legitimate reason, and harassed her because of her age.

## B. Rolling Out the Arbitration Agreement

A few years before things turned sour, though, AT&T rolled out an arbitration program to a large chunk of its employees, including Rivera.[3]  On November 30, 2011, AT&T sent Rivera an email (on her company email account with unique username and password) informing her of the proposed change.  The email told Rivera that under the program, "employees and the company would use independent, third-party arbitration rather than courts or juries to resolve legal disputes."  But unlike some other arbitration programs, AT&T's wasn't mandatory.  Instead, AT&T said that "[t]he decision on whether or not to participate [was Rivera's] to make," and that if she didn't want to participate in this alternative dispute resolution mechanism, she could opt out by following two links:  one in the email, and one in the webpage the email link opened.  There were no consequences for opting out (except, of course, that Rivera couldn't force AT&T to arbitrate its claims against her).

The offer came with a proviso, though:  if Rivera didn't opt out by the end of the day on February 6, 2012 (giving Rivera sixty-eight days to respond), AT&T would take it as though she opted in.  The email told her:  "[i]f you do not opt out by the

---

[3] Before 2011, AT&T didn't have an independent arbitration agreement with Rivera, or an arbitration provision in Rivera's employment contract.

deadline, you are agreeing to the arbitration process as set forth in the Agreement.  This means that you and AT&T are giving up the right to a court or jury trial on claims covered by the Agreement." The email advised Rivera to review the agreement before making a decision and instructed that if she wished to opt out, she needed to open the agreement and "follow the link provided there to the site where [she would] be able to electronically register [her] decision to opt out."  AT&T sent the same email to Rivera twice more--once in December 2011, and once in January 2012.  All three emails included instructions on how to opt out.

Opting out of the agreement required two steps.  First, as the email said, Rivera would need to open the agreement and acknowledge that she read it.  Every employee was required to conduct this first step regardless of whether they chose to opt out.  To complete this step, the employee needed to follow the link provided in the email, which led to a webpage that contained the full text of the agreement.  On that page, there was a button marked "Review Completed" in the upper-left-hand corner of the page.

According to AT&T's records (and she doesn't contend otherwise), Rivera completed this step and acknowledged that she read the agreement.  Indeed, according to AT&T's internal records of website traffic, Rivera viewed the arbitration agreement twice. The first time was in December 2011, although she didn't click the

- 6 -

acknowledgement button then. And on round two, she clicked the acknowledgement button less than an hour after the January 17, 2012 follow-up email was sent. Rivera doesn't dispute that it was she who clicked "Review Completed," nor does she argue that she clicked the acknowledgement button at the top of the page without scrolling down to read the agreement.[4]

Step two of the opt-out procedure: the employee had to click one additional link--this one in paragraph four of the agreement on that webpage. This paragraph, just a few lines into the agreement, discussed the opportunity to opt out and laid out the mechanism to do so: "[i]f you choose to opt out, use this link . . . which will take you to the site where you can electronically register your decision to opt out. That site will generate and send you a written confirmation of your decision to opt out." And, according to AT&T, a cohort of thousands of Rivera's colleagues followed that link and opted out of the arbitration agreement.

---

[4] The placement of the "Review Completed" button at the top of the agreement makes it a type of "clickwrap" agreement where the party doesn't need to actually scroll through the agreement before accepting it. See Cullinane v. Uber Techs., Inc., 893 F.3d 53, 61 n.1 (1st Cir. 2018) (quoting Berkson v. Gogo LLC, 97 F. Supp. 3d 359, 394 (E.D.N.Y. 2015)) (discussing the different types of acceptance processes for online agreements). So, technically, Rivera could have acknowledged the agreement without ever scrolling through to read it in its entirety. But because she doesn't argue that she never read the agreement, this case isn't really about the new questions internet-based contracts like these have raised, so we need not get into the weeds on that front.

Rivera has never argued, either to the district court or to us, that she did follow that link and tried to opt out but that the company just didn't register her decision. Nor has she argued that the opt-out procedure was confusing, or that she couldn't find how to opt out. In other words, she makes no argument that she affirmatively chose to opt out--or even wanted to do so--at the time the agreement was offered to her.

## C. Their Litigation

Eventually, AT&T fired Rivera in May 2016, and replaced her with a 34-year-old. Taking issue with the way things went down, Rivera sued AT&T, her supervisors, and some other unnamed parties (the last of which don't appear here) in the U.S. District Court for the District of Puerto Rico. She brought an array of claims for violations of her civil rights, alleging that AT&T discriminated against her for her age, in violation of Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e, et seq.; Puerto Rico Law 100, P.R. Laws Ann. tit. 29, §§ 146, et seq.; and Puerto Rico Law 69, P.R. Laws Ann. tit. 29, §§ 1321, et seq. She also alleged wrongful termination under Puerto Rico Law 80, P.R. Laws Ann. tit. 29, §§ 185, et seq.

Not so fast, said AT&T. It entered a special appearance and moved to stay the proceedings and compel arbitration, reminding Rivera that she agreed to arbitrate these kinds of claims, not bring them in court. So AT&T asked the court to force Rivera to

go to arbitration, thus stripping the district court of jurisdiction to hear the merits of the case. To support this result, AT&T submitted hundreds of pages of affidavits and exhibits to show that Rivera read the agreement and didn't opt out, and therefore accepted it.

Determined to stay where she was, Rivera opposed AT&T's attempt to push her into arbitration, maintaining that there was no valid arbitration agreement to begin with. She argued that Puerto Rico law requires acceptance of a contract, and that her mere failure to opt out can't meet the acceptance standard under the Commonwealth's laws.

Rejecting Rivera's contentions, the district court agreed with AT&T and said the arbitration agreement was enforceable. See Rivera-Colón v. AT&T Mobility P.R., Inc., 261 F. Supp. 3d 251, 256 (D.P.R. 2017). The judge looked to AT&T's submitted evidence, which showed that Rivera received the emails notifying her of the arbitration agreement and that she acknowledged that she read the agreement. And, given that evidence, the judge thought it clear that "AT&T gave [Rivera] explicit notice that all disputes would be solved by arbitration" so he granted AT&T's motion to compel arbitration and dismissed Rivera's suit.[5] See id. at 255-56.

---

[5] Although AT&T moved to stay the proceedings pending arbitration of the claims, the district judge elected to dismiss

Clinging to the assertions she advanced below, and repeats here on appeal, Rivera says the district court got it all wrong and asks us to reverse and give her the green light to litigate her claims in court.

**DISCUSSION**

**A. Standard of Review**

Generally, we review an order compelling arbitration on a spectrum of interwoven standards. At one end, when the appeal raises "solely legal issues as to the enforceability of an arbitration clause," we look at it with a clean slate, or de novo. Pelletier v. Yellow Transp., Inc., 549 F.3d 578, 580 (1st Cir. 2008); see also Britto v. Prospect Chartercare SJHSRI, LLC, 909 F.3d 506, 511 (1st Cir. 2018) (explaining de novo review in this context). The same de novo review applies when the facts surrounding the agreement are undisputed and the only question is whether they contractually bound themselves to arbitration on those undisputed facts. See Cullinane v. Uber Techs., Inc., 893 F.3d 53, 60 (1st Cir. 2018).[6] And given that the facts here are

the proceedings. See, e.g., Next Step Med. Co. v. Johnson & Johnson Int'l, 619 F.3d 67, 71 (1st Cir. 2010) (noting that, in this circuit, a district court has discretion "to dismiss the law suit, if all claims asserted in the case are found arbitrable"). The parties do not appeal this exercise of discretion.

[6] Although not applicable here, for the sake of thoroughness we remind the careful reader that were the facts in dispute, we would review the district court's determinations on a "sliding scale." See Quint v. A.E. Staley Mfg. Co., 246 F.3d 11, 14 (1st Cir. 2001). That is, "[t]he more the district court's conclusions

- 10 -

undisputed the only question that remains is whether those facts show that Rivera accepted the agreement as a matter of Puerto Rico law.  So, we review that determination of the district court de novo.  See Cullinane, 893 F.3d at 60.  That means we don't give any deference to the district court's conclusion and look at the legal issues with clear eyes.  See In re Extradition of Howard, 996 F.2d 1320, 1327 (1st Cir. 1993).  And it also means that we "can affirm on any ground appearing in the record--including one that the [district] judge did not rely on."  See Lang v. Wal-Mart Stores E., L.P., 813 F.3d 447, 454 (1st Cir. 2016) (citing Collazo-Rosado v. Univ. of P.R., 765 F.3d 86, 91 (1st Cir. 2014)).

Bearing in mind this appellate lens, we return to the legal issue before us.

## B.  A Primer on the Law

For reasons that will become clear in the next section, a legal primer will help frame our discussion.  So, we ask the patient reader to bear with us as we lay it out.

With the Federal Arbitration Act ("FAA"), Congress set a "liberal federal policy favoring arbitration."  AT&T Mobility LLC v. Concepcion, 563 U.S. 333, 346 (2011) (quoting Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983)).

---

are characterized as factual conclusions, the more our review of those facts is for clear error; the more the district court's conclusions are conclusions of law, the more independent review we give."  Id.

- 11 -

The FAA allows one party to an arbitration agreement to ask the court to put the litigation on hold and force the other party to arbitrate the disputes. See 9 U.S.C. § 4. At base, it respects arbitration as "a matter of contract" between parties and doesn't allow courts to jump in when the parties agreed to keep the courts out of the mix. See Henry Schein, Inc. v. Archer & White Sales, Inc., ____ S. Ct. ____, No. 17-1272, 2019 WL 122164, at *3 (U.S. Jan. 8, 2019). It "places arbitration agreements on equal footing with all other contracts," Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440, 443 (2006), which means that courts can invalidate arbitration agreements only on the same "generally applicable contract defense[]" grounds that would apply to all other contracts, Doctor's Assocs., Inc. v. Casarotto, 517 U.S. 681, 687 (1996).

But as a corollary to its contract-based philosophy, the FAA's "liberal policy" is only triggered when the parties actually agreed to arbitrate. It "does not require parties to arbitrate when they have not agreed to do so." Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Jr. Univ., 489 U.S. 468, 478 (1989). So, the existence of an enforceable agreement to arbitrate is the first needed step to trigger the FAA's protective reach. See Nat'l Fed'n of the Blind v. The Container Store, Inc., 904 F.3d 70, 80 (1st Cir. 2018) (noting that "a court should not compel arbitration unless and until it determines that the parties entered into a

- 12 -

validly formed and legally enforceable agreement covering the underlying claims" (quoting Escobar-Noble v. Luxury Hotels Int'l of P.R., Inc., 680 F.3d 118, 121 (1st Cir. 2012))). And the party seeking to compel arbitration (here, that's AT&T) bears the burden of clearing that hurdle and "demonstrat[ing] that a valid agreement to arbitrate exists." Soto-Fonalledas v. Ritz-Carlton San Juan Hotel Spa & Casino, 640 F.3d 471, 474 (1st Cir. 2011) (quoting InterGen N.V. v. Grina, 344 F.3d 134, 142 (1st Cir. 2003)) (internal quotation marks omitted).

Because arbitration is a creature of contract, "principles of state contract law control the determination of whether a valid agreement to arbitrate exists." Id. at 475 (quoting Campbell v. Gen. Dynamics Gov't Sys. Corp., 407 F.3d 546, 552 (1st Cir. 2005)). Rivera and AT&T assume that Puerto Rico law applies--a rational choice we won't disturb here given that Rivera was employed in the Commonwealth. See, e.g., Rodríguez v. United States, 54 F.3d 41, 44 (1st Cir. 1995) (assuming that Puerto Rico law applies when the parties assumed so and there was a "reasonable relation" between the cause of action and Puerto Rico). So, if an enforceable contract exists under Puerto Rico law, we must enforce that agreement "save upon such grounds as exist at law or in equity for the revocation of any contract," 9 U.S.C. § 2, and send the parties off to arbitrate.

- 13 -

This brings us to the skirmish the parties are waging before us today.  Put simply:  if Rivera never agreed to arbitrate her claims against AT&T, she's free to pursue them in court; but if she did agree to arbitrate her claims against AT&T, she's bound by her contract and she must resolve those claims through arbitration.  So, this is all we need to decide here.  See Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 218 (1985) (noting that the FAA "mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed"); see also Escobar-Noble, 680 F.3d at 122.  The merits of her employment-based claims against AT&T are left for another day, another umpire, and another ballpark (whether judicial or arbitral).

## C.  The Arguments

Against this backdrop, the parties argue primarily over the application of Puerto Rico contract law.  Unsurprisingly, they don't see eye to eye on how that law applies to the situation here.

Rivera argues there's no enforceable agreement to arbitrate because she never accepted AT&T's unsolicited offer.  As best we can tell, she makes this omnibus argument in what breaks down into three waves.  First, according to her, Puerto Rico law doesn't construe an offeree's silence or inaction as acceptance to a contract offer when that offer was made at the offeror's sole initiative.  She says that there was no bargaining between her and

- 14 -

AT&T about the arbitration agreement, so she had no obligation to respond to say yes or no to its offer. And, she argues that under Puerto Rico law, an offeror cannot impose on the offeree an obligation to respond to an unsolicited offer. That is, if AT&T makes an unsolicited offer, it can't force Rivera to respond and say no, or to stipulate that her lack of response will be interpreted as saying yes.

Wave two is a rebuttal point. She says that even if she could accept with her silence, the facts here don't unequivocally show her intent to accept the contract, so she didn't accept this agreement. And in wave three, she adds two alternative arguments: that this arbitration agreement is both a waiver of substantive rights and a type of forum selection clause--both of which require a heightened standard of acceptance under Puerto Rico law, which can't be met here.

AT&T, for its part, says that Puerto Rico law permits silence as an avenue to acceptance of a contract, although it acknowledges that there's no Puerto Rico precedent directly on point. But it says that under the limited precedent we have, the facts of this case show that Rivera knew that her silence and continued employment would constitute acceptance of the arbitration agreement--and that her actions show that she willfully accepted. It says that she acknowledged that she read the provision that stipulated that her continued employment and

failure to opt out of the agreement would constitute her acceptance. And, her inaction coupled with her continued employment shows that her conduct was informed and voluntary. So, Rivera demonstrated her will to accept AT&T's offer, and is bound by the arbitration agreement.

**ANALYSIS**

**A.  The Framework**

To assess these arguments, we first must look to the framework of Puerto Rico contract law, and note some guideposts of Puerto Rico law that shape our analysis.

Puerto Rico is unique in many ways, its legal system just one of them. As a civil law jurisdiction, "Puerto Rico eschews common law principles of contract interpretation in favor of its own civil code derived from Spanish law." Borschow Hosp. & Med. Supplies v. Cesar Castillo Inc., 96 F.3d 10, 15 (1st Cir. 1996) (citing Guevara v. Dorsey Labs., Div. of Sandoz, Inc., 845 F.2d 364, 366 (1st Cir. 1988)). So we can't use stateside common law to "fill[] gaps in the civil law system" unless the Civil Code and the Supreme Court of Puerto Rico are silent on the issue. Guevara, 845 F.2d at 366 (citing Valle v. Am. Int'l Ins. Co., 108 D.P.R. 692, 696-97, 8 P.R. Offic. Trans. 735 (1979)). We turn first to those sources.

To form a valid contract under Puerto Rico law, both parties must consent to it. See P.R. Laws Ann. tit. 31, § 3391.[7] That consent "is shown by the concurrence of the offer and acceptance of the thing and the cause which are to constitute the contract." P.R. Laws Ann. tit. 31, § 3401. In simple terms: "acceptance of an offer is . . . the normal procedure to perfect a contract." Producciones Tommy Muñiz Inc. v. Comité Organizador de Los VIII Panamericanos (COPAN), 113 D.P.R. 517, 13 P.R. Offic. Trans. 664, 670 (1982). But "[c]onsent given by error, under violence, by intimidation, or deceit shall be void." P.R. Laws Ann. tit. 31, § 3404; see also Dialysis Access Ctr., LLC v. RMS Lifeline, Inc., 638 F.3d 367, 378 (1st Cir. 2011) (discussing how consent may be void under Puerto Rico law).

This case presents a twist on the normal question, though. In the more typical case, the employee accepts the contract by signing on the dotted line, thus leaving little doubt that she accepted the agreement. But we consider here whether Rivera accepted the agreement by doing nothing--through her inaction or silence.[8]

---

[7] You also need to have "[a] definite object which may be the subject of the contract," and "[t]he cause for the obligation which may be established." P.R. Laws Ann. tit. 31, § 3391. But that's not what the parties are arguing about here.

[8] We note that AT&T doesn't argue that Rivera accepted the agreement when she acknowledged that she read it. It says that she accepted it when she did not opt out and continued to work.

- 17 -

Although that brand of acceptance doesn't find its own distinct provision in the Puerto Rican Civil Code, the Supreme Court of Puerto Rico has recognized that not all acceptances are in writing--implied consent to a contract is enough to meet the Puerto Rico definition of acceptance. See Teachers Annuity & Ret. Sys. v. Sociedad de Gananciales, 115 D.P.R. 277, 15 P.R. Offic. Trans. 372, 386-87 (1984); see also Colón Gutiérrez v. Registrador, 114 D.P.R. 850, 14 P.R. Offic. Trans. 1095, 1110 (1983) (noting that consent to an agreement can be given "expressly or impliedly"). When it comes to this type of implied consent, "the determining element . . . is the person's conduct and not the words used to express such consent." Teachers Annuity & Ret. Sys., 115 D.P.R. 277, 15 P.R. Offic. Trans. at 387. That conduct "should inequivocally [*sic*] show the will to consent," and the facts "cannot be compatible with, another intent, or be subject to many different interpretations." Id. 115 D.P.R. 277, 15 P.R. Offic. Trans. at 387-88. And the party accepting must have "adequate knowledge of the scope of [her] statement" to be able to adequately evidence her consent. See Colón Gutiérrez, 114 D.P.R. 850, 14 P.R. Offic. Trans. at 1111. But on the precise question here (whether silence is acceptance when the offeror conditions that it will be), the Supreme Court of Puerto Rico has not spoken.

When the Civil Code and the Supreme Court of Puerto Rico are silent on an issue, we may forgo the traditional prohibition

on use of common law principles and "employ the common law in its multiple and rich versions . . . as a point of reference for comparative law." Valle, 108 D.P.R. 692, 8 P.R. Offic. Trans. at 738; see also Guevara, 845 F.2d at 366 (applying stateside common law principles when "useful and persuasive" and when we "believe[d] the Supreme Court of Puerto Rico would follow essentially the same path"). That is particularly true when the Supreme Court of Puerto Rico has, on a particular subject, "conformed its . . . jurisprudence to common law principles." Rodríguez, 54 F.3d at 45. And in the contract-acceptance context, Puerto Rico law "mimics the general law of contracts," Satellite Broad. Cable, Inc. v. Telefónica de España, S.A., 807 F. Supp. 210, 216 (D.P.R. 1992), and operates in the same way as the "governing rule in the United States," see COPAN, 113 D.P.R. 517, 13 P.R. Offic. Trans. at 672 (referencing U.S. treatises Williston on Contracts and Corbin on Contracts). Which is all a long explanation of why we will, at times, look to those stateside treatise sources to fill in the gap here.

## B. Addressing Those Arguments

*Wave I: Assessing Rivera's Intent in Silence*

With that legal outline in mind, we turn to the core of this case: do the (undisputed) facts unequivocally show that Rivera manifested her intent to accept AT&T's arbitration agreement?

- 19 -

To tackle that question, we begin with a recount of one of our prior cases, the closest we've gone to addressing an issue like this under Puerto Rico law, which will prove instructive in assessing the one before us now. In Marrero-García v. Irizzary, 33 F.3d 117 (1st Cir. 1994), we discussed a similar, albeit distinct, issue. There, a utility company argued that residents of a condominium complex impliedly accepted a contract to pay for water services that the utility had already begun providing to them. See 33 F.3d at 122. The utility company "repeatedly requested the Condominium to place a bond and to register an account," and informed the residents they needed to take these actions to become "registered users."[9] Id. But when the residents never posted a bond or registered with the utility company, the utility company set up an account for them and started sending bills for water. The utility company then sued when the residents refused to pay. We rejected the utility company's implied-acceptance argument, holding that the residents' refusal to register was not implied consent to the agreement to pay for water services, but rather a rejection of that offer. And the key takeaway we reap from this case is that "[a]n offeree's inaction or 'silence in the face of the offer to sell goods is not ordinarily an acceptance, because the offeror has no reason to believe from

_____

[9] The utility company didn't add a proviso deeming silence as acceptance, like AT&T did here.

- 20 -

the offeree's silence that the offeree promises to buy.'"  Id.
(quoting Farnsworth on Contracts § 3.15).

To be sure, the facts of Rivera's case add a wrinkle to
a Marrero-García-style analysis:  AT&T specified that Rivera's
silence would constitute acceptance.  Rivera thinks this wrinkle
will cut in her direction.  She's correct that it makes all the
difference here, but it makes all the difference in a way she
doesn't imagine:  it is actually AT&T's stipulation of silence as
acceptance that tilts the scale away from Rivera's position, and
leads us to the opposite of the conclusion we reached in Marrero-
García.  Let us explain.

Of course, as Rivera reminds us, it's basic contract law
that an offeror cannot unilaterally impose on another party the
obligation to respond and reject their offer.  See, e.g., 1 Corbin
on Contracts § 3.19 (2018) ("It should here be plainly set forth
that an offeror has no power to cause the silence of the offeree
to operate as an acceptance when the offeree does not intend it to
do so."); 2 Williston on Contracts § 6:50 (4th ed. 1993) ("Merely
sending an unsolicited offer does not impose upon the party
receiving it any duty to speak or deprive the party of its
privilege of remaining silent without accepting.").  But this
general statement of the law is just that--a generality.  There
are, as always, exceptions.  Indeed, the Restatement (which Rivera
cites in her brief) makes it clear that silence can operate as

acceptance "[w]here the offeror has stated or given the offeree reason to understand that assent may be manifested by silence or inaction, and the offeree in remaining silent and inactive intends to accept the offer." Restatement (Second) of Contracts § 69(1)(b); see also 2 Williston on Contracts § 6:53 ("If the situation for any reason is such that a reasonable person would construe silence as necessarily indicating assent, the offeree who keeps silent, knowing that its silence will be misinterpreted, should not be allowed to deny the natural interpretation of its conduct."). This aligns with the notion in Puerto Rico that "silence could imply the tacit acceptance of an offer when, pursuant to a prior relationship between the parties, the responsibility arises for the one receiving the offer to take affirmative action to reject it." Danosa Caribbean, Inc. v. Santiago Metal Mfg. Corp., 179 D.P.R. 40, No. CC-2008-882, slip op. at 21 (2010) (Rodríguez Rodríguez, J., dissenting) (citing Carlos Lasarte, 3 Principios del Derecho Civil 63 (4th ed. 1996)).[10]

And that's where the scale flips away from Rivera. AT&T stipulated that if Rivera didn't opt out, it would take it as though she opted in. Rivera acknowledged that she read that provision (both here in litigation, and when she acknowledged that

_____

[10] We requested that the parties file a certified translation of this otherwise-untranslated case from the Supreme Court of Puerto Rico.

she read the agreement back in 2012).  It was laid out nose-to-face plain and simple in the emails AT&T sent her, as well as in the arbitration agreement that she confirmed she received and read.  So, by acknowledging that she read that proviso, she actually gave AT&T "reason to believe from [her] silence that [she] promise[d]" to arbitrate her claims, unlike the residents in Marrero-García.  See 33 F.3d at 122 (quoting Farnsworth on Contracts § 3.15).  Thus, these facts evidence Rivera's intent to accept the agreement.

*Wave II: Was That Intent Unequivocal?*

So we move on to wave two of her argument:  that even if she could accept with her silence in these circumstances,[11] the facts here don't *unequivocally* show her intent to accept the contract.

Under Puerto Rico law, the facts "should inequivocally [*sic*] show the will to consent . . . [and] cannot be compatible with, another intent, or be subject to many different interpretations."  Teachers Annuity & Ret. Sys., 115 D.P.R. 277, 15 P.R. Offic. Trans. at 387-88.  Rivera (quite obviously) argues that her actions here don't unequivocally show her will to consent.  Her position is twofold.  First, she says that "there is no scintilla of evidence on the record that [she] ever intended to accept the offer.  In fact, the opposite holds true.  When [AT&T]

---

[11] Indeed, Rivera acknowledges that silence can, "in certain circumstances," constitute acceptance.

- 23 -

attempted to enforce the 'contract,' [she] opposed."  And second is that the facts only show that she "acknowledge[d] having reviewed the document"; not that she intended to accept it. Addressing these arguments in turn, they both fail.

First, her objection to arbitration when this litigation commenced in 2017 has no bearing on whether she manifested her intent to accept the agreement back in 2012.  We say that for two reasons:  one legal and one logical.  On the legal side, it doesn't carry weight because it misses the operative timeframe for assessing her intent.  It's basic Puerto Rico contract law that contracts are formed and valid "from the moment" consent is given. See P.R. Laws Ann. tit. 31, §§ 3371, 3375.  So, the question is whether she manifested her intent to accept the agreement way back in 2012 when she didn't opt out; not what happened in 2017.  Which is all to say that this argument doesn't get her anywhere.  And that's not to mention that the logical side of her argument is baffling.  Disputes of this sort arise in litigation precisely because a party later disputes whether they intended to accept a contract.  So, if a party's later disavowment of their intent to accept a contract bore any decisive weight (as Rivera seems to suggest it should), it would make analysis unnecessary.  This would make the cases we just discussed pure excess--which they are not. Cf. generally Teachers Annuity & Ret. Sys., 115 D.P.R. 277, 15 P.R. Offic. Trans. at 387-88 (looking to the facts at the time of

the purported contract formation to determine if implied consent existed even though the party later disputed their consent in litigation); Cemex De P.R., Inc. v. Ductor, Inc., No. CIV.A. 09-2254 (GAG), 2010 WL 1727834, at *1 (D.P.R. Apr. 26, 2010) (finding that plaintiff sufficiently alleged implied consent even when the party later disputed the consent during litigation).

And her second argument (that her intent in clicking the review completed button was to show only that she acknowledged reading the agreement)[12] is even more troubling and actually self-defeating.  Again, it is critical to note that Rivera doesn't attempt to say that she didn't know her silence would be treated as opting in.  Instead of confronting this head on, though, her argument tries to leapfrog over her contractual obligations by relying on a general rule that AT&T couldn't make her respond.[13]

---

[12] In the same vein of this argument, Rivera also proposes a new standard we should apply.  She says that if AT&T wanted an arbitration agreement with her, it should have made it so that she "would have taken affirmative steps to clearly and unmistakenly [*sic*] affirm her intent to be bound by an agreement to arbitrate." But imposing that requirement would force us to ignore the Supreme Court of Puerto Rico's clear instruction that a contract can be formed with implied consent.  See generally Teachers Annuity & Ret. Sys., 115 D.P.R. 277, 15 P.R. Offic. Trans. 372.  And we cannot do so.  See, e.g., Wainwright v. Goode, 464 U.S. 78, 84 (1983) ("[T]he views of the state's highest court with respect to state law are binding on the federal courts."); Rochester Lincoln-Mercury, Inc. v. Ford Motor Co., 248 F.3d 46, 48 (1st Cir. 2001) (same).

[13] To support this argument, Rivera provides us with one- or two-sentence excerpts from three Spanish commentators about silence as a mode of acceptance under the Spanish Civil Code. Initially, the translations were made only by her counsel, which

- 25 -

But this argument strikes out just as quickly as the first, because it glances over the exception (rooted in notions of good faith) that aims to root out the type of maneuvers she's trying to make here:  "the offeree who keeps silent, knowing that [her] silence will be misinterpreted, should not be allowed to deny the natural interpretation of [her] conduct."  2 Williston on Contracts § 6:53.

That exception is especially pertinent in situations like this (just as the Restatement, Corbin, and Williston have noted[14]), where "given a certain relationship between two people, the current way of proceeding implies the duty to speak."  Danosa

---

was out of compliance with our Local Rule requiring certified translations of Spanish documents.  See 1st Cir. Local R. 30.0(e). In her reply brief, Rivera provided certified translations of those three snippets, but not the broader context from which they came. And, as we've said in the past, isolated excerpts from treatises not translated into English are not useful support.  See, e.g., United States v. Ramos-González, 775 F.3d 483, 505 & n.26 (1st Cir. 2015) (noting that a counsel-translated sentence from a Spanish-language treatise on Puerto Rico's penal code, not otherwise available in English, is not "useful support" for an argument).  Especially given the potential for these excerpts to be read out of context, we decline to use them here.

[14] See Restatement (Second) of Contracts § 69(1)(c) (noting the exception where silence is acceptance "because of previous dealings or otherwise, it is reasonable that the offeree should notify the offeror if he does not intend to accept"); 1 Corbin on Contracts § 3.18 ("Often, however, silence coupled with conduct or with expectations engendered by a prior relationship can reasonably be understood by the offeror as an acceptance."); 2 Williston on Contracts § 6:50 (noting that "the relationship between the parties or other circumstances surrounding the transaction may be such as to justify the offeror in expecting a reply, and, therefore, in assuming that silence in fact does indicate assent to its proposal").

Caribbean, 179 D.P.R. 40, slip op. at 21 (Rodríguez Rodríguez, J., dissenting) (quoting Lasarte, 3 Principios del Derecho Civil 63).

Unlike the unsolicited offer-by-mail to which Rivera tries to liken this case, this wasn't an offer made by a stranger. Rivera and AT&T were engaged in a long-standing, close legal relationship as employee and employer. That relationship--one in which AT&T and its employees regularly communicated company business with one another via email[15]--implicates Rivera's knowledge that she had the duty to speak and that her choice not to would be reasonably interpreted by AT&T as acceptance. Cf. Circuit City Stores, Inc. v. Najd, 294 F.3d 1104, 1109 (9th Cir. 2002) (O'Scannlain, J.) (noting in a very similar context under California law that the employee and employer "were not two typical parties contracting at arm's length," and that the employee had a responsibility to affirmatively opt out if he didn't want to accept). And when "the one who can and should speak does not do so, it must be deemed that [s]he consents for the sake of good faith . . . because in such cases, it is *natural and normal to manifest dissent*." Danosa Caribbean, 179 D.P.R. 40, slip op. at 21 (Rodríguez Rodríguez, J., dissenting) (emphasis added) (quoting Lasarte, 3 Principios del Derecho Civil 63). So absent her dissent, the natural interpretation of her conduct is that she

---

[15] AT&T communicated at least twenty corporate policies to its employees in the year prior to the arbitration proposal.

- 27 -

accepted.  And that must stand.  Thus, we agree with the district court that Rivera impliedly accepted this arbitration agreement and is bound by it.

*Wave III: A Heightened Standard of Acceptance*

But wait, Rivera has two alternative arguments to try to steer us back to her side.  She calls this agreement both a waiver of substantive rights and a forum selection clause.  And she contends that under Puerto Rico law, this means that a heightened standard of acceptance should apply to the agreement.  That is, standard modes of consent aren't enough to accept this type of agreement.  But unfortunately for Rivera, these arguments don't move the needle in her direction.

First, she argues that a heightened standard of contract acceptance should apply here because the agreement is a waiver of a substantive right (the substantive right being her right to a jury trial).  And, under Puerto Rico law, "such renunciation[s] of rights . . . must be clear, conclusive, express, and unequivocal." Quiñones Quiñones v. Quiñones Irizarry, 91 D.P.R. 225, 91 P.R.R. 217, 257 (1964).

But even assuming she waived a substantive right with this agreement--and a jury trial is decidedly a procedural right, see, e.g., Libretti v. United States, 516 U.S. 29, 53-54 (1995) (Souter, J., concurring) (recognizing the right to a jury trial is a procedural right)--her argument smacks up against one of the

core principles of the FAA: a state (or territory) cannot apply any standard to an arbitration agreement that it does not apply to contracts in general, see Soto v. State Indus. Prods., Inc., 642 F.3d 67, 74 (1st Cir. 2011) ("[W]hile Puerto Rico may impose special restrictions on noncompetition agreements, it is preempted from imposing special restrictions on arbitration agreements."); see also Doctor's Assocs., Inc., 517 U.S. at 687 (noting that with the FAA, "Congress precluded States from singling out arbitration provisions for suspect status, requiring instead that such provisions be placed 'upon the same footing as other contracts'").

And that Supreme Court command also torpedoes her second argument that this supposed "forum selection" agreement[16] manifesting as an arbitration agreement can be void for public policy. She says that in Puerto Rico, forum selection agreements are unenforceable if: "(1) they were not freely negotiated or were the result of overweening bargaining power; or (2) they contravene a strong public policy." But again, even assuming for the sake of argument that Rivera can meet one of these grounds, under the FAA's protective grasp, an arbitration agreement can be voided only on "generally applicable contract defense[]" grounds that would apply to all other contracts. Doctor's Assocs., Inc.,

---

[16] By this, we mean an agreement between parties specifying where they'll duke out their legal disputes. See, e.g., Marra v. Papandreou, 216 F.3d 1119, 1123 (D.C. Cir. 2000).

517 U.S. at 687.  And although Puerto Rico can hold forum selection clauses to a higher standard, it "is preempted from imposing special restrictions on arbitration agreements."  See Soto, 642 F.3d at 74.  So her final argument falls flat.

## C.  Postscript

Before we sum up, we add one last point.  The careful reader will notice that we reach our ultimate conclusion on the key issue here (whether Rivera impliedly consented to the arbitration agreement) under a different legal standard than the district court.[17]  And on that subject, we add a postscript.

The district court judge said the focal point of the legal question was "whether AT&T gave [Rivera] explicit notice that all disputes would be solved by arbitration."  Rivera-Colón, 261 F. Supp. 3d at 256 (citing García-Clara v. AIG Ins. Co. P.R., No. CV 15-1784CCC, 2016 WL 1261058 (D.P.R. 2016)).  That test, in our view, misses the point.  The contract formation question here is whether Rivera *accepted* the contract--not whether she was merely on notice of the contract's existence.

The district court (and the García-Clara court on which it relied) seems to have misconstrued our holdings in Campbell v. General Dynamics Government Systems Corp., 407 F.3d 546 (1st Cir.

---

[17] Again, we're free to take this different route under de novo review because we're free to "affirm on any ground appearing in the record--including one that the [district court] judge did not rely on."  Lang, 813 F.3d at 454.

2005), and <u>Rosenberg</u> v. <u>Merrill Lynch, Pierce, Fenner & Smith, Inc.</u>, 170 F.3d 1 (1st Cir. 1999).  In those cases, the question was, in fact, one of notice.  They turned on whether the employer gave the employees sufficient notice that certain statutory claims (those under the Americans with Disabilities Act, 42 U.S.C. §§ 12101, <u>et seq.</u>) would be covered under an arbitration agreement.  And that was so important because the ADA has a specific provision that limits arbitration of claims to situations when it would be "appropriate."  <u>See</u> 42 U.S.C. § 12212.  So that was relevant to the arbitrability of the particular claims at issue there, not the arbitrability of all claims under the sun.  But here, the parties don't dispute that the particular claims are arbitrable.  The only question is whether a valid arbitration agreement existed in the first place, which means that the question is one of contract acceptance--not notice.  <u>See</u> <u>Campbell</u>, 407 F.3d at 554 (explaining that the questions of whether there was a valid arbitration agreement and whether the parties had notice that ADA claims were covered under it were "independent, yet overlapping, issues").

## WRAP-UP

Our work done, and finding, as we do, that the district court got the outcome right, we affirm the order compelling arbitration.  Costs to appellees.  <u>See</u> Fed. R. App. P. 39(a)(2).

- 31 -